# EXHIBIT A

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

DANIEL L. PETERSON, M.D., SIERRA INTERNAL MEDICINE, DANIEL. L. PETERSON, M.D.,
LTD., SIMMARON RESEARCH, and DOES 1 through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

JANE DOE

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

Electronically
**FILED**
Superior Court of California, County of San Mateo
4/28/2022

By **/s/ Anthony Berini**
Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

400 County Center, San Mateo County Superior Court
Redwood City, CA 94063

CASE NUMBER: *(Número del Caso):*
22-CIV-01779

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Christina Wong, Baker & McKenzie LLP, Two Embarcadero Center, 11th Floor, San Francisco, CA 94111, Tel: 415 576 3022

DATE: 4/28/2022          Neal I. Taniguchi
*(Fecha)*                                Clerk, by          /s/ Anthony Berini          , Deputy
                                         *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [XX] as an individual defendant. - DANIEL L. PETERSON, M.D.
2. [  ] as the person sued under the fictitious name of *(specify):*
3. [  ] on behalf of *(specify):*

   under: [  ] CCP 416.10 (corporation)          [  ] CCP 416.60 (minor)
          [  ] CCP 416.20 (defunct corporation)  [  ] CCP 416.70 (conservatee)
          [  ] CCP 416.40 (association or partnership) [  ] CCP 416.90 (authorized person)
          [  ] other *(specify):*
4. [X] by personal delivery on *(date):* 5/2/22

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Christina M. Wong (State Bar No. 288171) / Baker & McKenzie LLP
Two Embarcadero Center, 11th Floor, San Francisco, CA 94111

TELEPHONE NO.: 415 576 3000    FAX NO. *(Optional):* 415 576 3099
E-MAIL ADDRESS: christina.wong@bakermckenzie.com
ATTORNEY FOR *(Name):* Plaintiff JANE DOE

**FOR COURT USE ONLY**

**Electronically FILED**
by Superior Court of California, County of San Mateo
ON   4/28/2022
By   /s/ Anthony Berini
     Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN MATEO
STREET ADDRESS: 400 County Center
MAILING ADDRESS: 400 County Center
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern Branch

CASE NAME:
JANE DOE v. DANIEL L. PETERSON, M.D.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: 22-CIV-01779 |
|---|---|---|
| ✓ Unlimited (Amount demanded exceeds $25,000) □ Limited (Amount demanded is $25,000 or less) | □ Counter  □ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
□ Auto (22)
□ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
□ Asbestos (04)
□ Product liability (24)
□ Medical malpractice (45)
□ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
□ Business tort/unfair business practice (07)
□ Civil rights (08)
□ Defamation (13)
✓ Fraud (16)
□ Intellectual property (19)
□ Professional negligence (25)
□ Other non-PI/PD/WD tort (35)
**Employment**
□ Wrongful termination (36)
□ Other employment (15)

**Contract**
□ Breach of contract/warranty (06)
□ Rule 3.740 collections (09)
□ Other collections (09)
□ Insurance coverage (18)
□ Other contract (37)
**Real Property**
□ Eminent domain/Inverse condemnation (14)
□ Wrongful eviction (33)
□ Other real property (26)
**Unlawful Detainer**
□ Commercial (31)
□ Residential (32)
□ Drugs (38)
**Judicial Review**
□ Asset forfeiture (05)
□ Petition re: arbitration award (11)
□ Writ of mandate (02)
□ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
□ Antitrust/Trade regulation (03)
□ Construction defect (10)
□ Mass tort (40)
□ Securities litigation (28)
□ Environmental/Toxic tort (30)
□ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
□ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
□ RICO (27)
□ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
□ Partnership and corporate governance (21)
□ Other petition *(not specified above)* (43)

2. This case □ is ✓ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. □ Large number of separately represented parties
   b. □ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. □ Substantial amount of documentary evidence
   d. □ Large number of witnesses
   e. □ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. □ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ✓ monetary  b. ✓ nonmonetary; declaratory or injunctive relief  c. ✓ punitive
4. Number of causes of action *(specify):* Seven (7): fraud, breach of contract, conversion, etc.
5. This case □ is ✓ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 28, 2022
Christina M. Wong

(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

CIVIL CASE COVER SHEET



| **SUPERIOR COURT OF SAN MATEO COUNTY**<br>Civil Division<br>400 County Center, 1st Floor, Room A Redwood City, CA 94063<br>(650) 261-5100<br>www.sanmateocourt.org | FOR COURT USE ONLY<br>**FILED**<br>**SAN MATEO COUNTY**<br>4/28/2022 |
|---|---|
| PETITIONER/PLAINTIFF:  **JANE DOE** | **Clerk of the Superior Court**<br>/s/ Anthony Berini |
| RESPONDENT/DEFENDANT:  **DANIEL L. PETERSON, M.D., LTD. ; SIERRA INTERNAL MEDICINE; DANIEL L. PETERSON, M.D., LTD; SUMMARON RESEARCH; DOES 1 THROUGH 50, INCLUSIVE** | DEPUTY CLERK |
| **NOTICE OF ASSIGNMENT FOR ALL PURPOSES (CIVIL) AND NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>**22-CIV-01779** |

By order of the Presiding Judge pursuant to San Mateo County Superior Court Local Rule 3.200(a) the above entitled matter is assigned for all purposes to: **Judge V. Raymond Swope** in **Department 23.**

### An Initial Case Management Conference is set before the Civil Commissioner (and not with the assigned Judge), as follows:
### DATE: 8/29/2022
### TIME: 9:00 AM
### LOCATION: 800 North Humboldt Street, San Mateo, CA 94401

REMOTE APPEARANCES ARE STRONGLY ENCOURAGED.  Please visit our website for information on remote appearances and use the "Civil Commissioner" Credentials:
https://www.sanmateocourt.org/general_info/remote_appearance.php

---

ASSIGNED DEPARTMENT INFORMATION

To schedule a Law and Motion Hearing, please see Local Rule 3.402, or visit the assigned Judicial Officer's webpage at: www.sanmateocourt.org/civiljudges.

Contact information for your assigned department is as follows:

| Judicial Officer | Department Phone | Department E-mail |
|---|---|---|
| V. Raymond Swope | 650-261-5123 | Dept23@sanmateocourt.org |

---

CASE MANAGEMENT CONFERENCE INFORMATION

You are hereby given notice of your Initial Case Management Conference.  The date, time and department are noted above.

1. In accordance with applicable California Rules of the Court and Local Rules, you are hereby ordered to:
   a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 3.110(b); Local Rule 3.804).
   b) Serve a copy of this Notice, blank form of the Case Management Statement and ADR Information Package on all named parties in this action (Local Rule 3.804(a)). Documents are available online under the CIVIL CMC Packet section at: http://sanmateocourt.org/court_divisions/civil/
   c) File and serve a completed Case Management Statement at least 15 days before the Case Management

Rev. November 2020

Conference (CRC 3.725; Local Rule 3.805(c)). Failure to do so may result in monetary sanctions or the continuance of the CMC.

d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 3.724 no later than 30 days before the date set for the Case Management Conference (Local Rule 3.805(b)).

2. Parties may proceed to an Appropriate Dispute Resolution process ("ADR") by filing a *Stipulation and Order to ADR* (Local Form ADR-CV-1). File and serve the completed *Stipulation and Order to* ADR form at least 12 days prior to the Case Management Conference (Local Rule 3.805(f)). You may find this form and information regarding the Civil ADR Program online at http://sanmateocourt.org/court_divisions/adr/civil/

For additional information, you may visit the Judicial officer's webpage at: www.sanmateocourt.org/civiljudges

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that I am the clerk of this Court, not a party to this cause; that I served a copy of this notice on the below date, ☐ by hand ☐ by electronic service to the parties or their counsel of record at the email addresses set forth below and shown by the records of this Court  or  ☒ by placing a copy thereof in separate sealed envelopes addressed to the address shown by the records of this Court, and by then sealing said envelopes and depositing same, with postage fully pre-paid thereon, in the United States Mail at Redwood City, California.

Date: 4/28/2022

Neal I Taniguchi, Court Executive Officer/Clerk

By:   /s/ Anthony Berini

Anthony Berini, Deputy Clerk

Notice being served on:

BARRY J THOMPSON
BAKER & MCKENIZE LLP
10250 CONSTELLATION BOULEVARD
SUITE 1850
LOS ANGELES CA 90067

Rev. November 2020

1  Barry J. Thompson, State Bar No. 150349
   barry.thompson@bakermckenzie.com
2  **BAKER & McKENZIE LLP**
3  10250 Constellation Blvd., Suite 1850
   Los Angeles, CA 90067
4  Telephone: 310 201 4728
   Facsimile:  310 201 4721
5
6  Christina M. Wong, State Bar No. 288171
   christina.wong@bakermckenzie.com
7  Peter W. Shapiro, State Bar No. 340226
   peter.shapiro@bakermckenzie.com
8  **BAKER & McKENZIE LLP**
   Two Embarcadero Center, 11th Floor
9  San Francisco, CA 94111
   Telephone: 415 576 3000
10 Facsimile: 415 576 3099
11
   Attorneys for Plaintiff
12 JANE DOE

13            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                     **FOR THE COUNTY OF SAN MATEO**

15

16 JANE DOE,                          Case No. _____ 22-CIV-01779 _____

17            Plaintiff,              **COMPLAINT FOR:**

18      v.                           1)  FRAUD;
                                      2)  BREACH OF CONTRACT;
19 DANIEL L. PETERSON, M.D.;          3)  CONVERSION;
   SIERRA INTERNAL MEDICINE;          4)  CIVIL PENALTIES FOR RECEIPT
20 DANIEL L. PETERSON, M.D., LTD.;        OF STOLEN PROPERTY
   SIMMARON RESEARCH; and                 (PENAL CODE § 496(c));
21 DOES 1 through 50, inclusive,     5)  RESTITUTION/QUASI-
22                                        CONTRACT OR UNJUST
            Defendants.                   ENRICHMENT;
23                                    6)  INTENTIONAL INFLICTION OF
                                          EMOTIONAL DISTRESS;
24                                    7)  VIOLATION OF CAL. HEALTH &
                                          SAFETY CODE §§ 123120 *et seq.*
25
26                                    **DEMAND FOR JURY TRIAL**
27
28

Electronically
FILED
by Superior Court of California, County of San Mateo
ON         4/28/2022
By      /s/ Anthony Berini
              Deputy Clerk

1
COMPLAINT

## INTRODUCTION

1.      This case involves a renowned and supposedly trustworthy physician who abused his position as a doctor and scientist in a population of very sick patients. He sold his patients out purely for financial gain, holding himself out as someone who could provide a vital experimental medicine to Jane Doe and other vulnerable patients like her and thereby restore their health. Remarkably, the doctor did all of this in the context of a clinical trial study, purportedly conducted under FDA auspices. He, directly and/or through his alter-ego companies, repeatedly and seriously violated the study protocol, did not inform Jane Doe of a serious drug shortage in violation of his obligations as principal investigator, lied about the bottle price of the experimental medication to enrich himself and conceal the fact that he was attempting to commit illegal balance billing of Medicare patients, lied about his ability to procure an entire year of the drug providing him the use of tens of thousands of dollars of his patients' money interest-free and ultimately allowing him to steal the money, lied about the fact that only a small fraction of the purchased drug had been shipped, lied about his commitment to refund the money and hold it in a special escrow account, and secretly withdrew Jane Doe from the study in an effort to prevent her from obtaining a refund. The doctor has engaged in this outrageous conduct with impunity because he held the ultimate trump card—the ability to, unilaterally for no reason, remove patients from the trial (thus denying them access to the life-altering drug). In some cases, as with Jane Doe, he also had additional leverage over his patients: the control of paperwork to support Jane Doe's ongoing disability entitlements as well as access to other medications that would be extremely difficult to obtain from other physicians.

2.      But, after much time, the scam was exposed, and it was the age-old story of a self-serving doctor misleading his patients solely to make himself and his alter-ego companies as much money as possible. Unfortunately, his actions, and those of his alter-ego companies, have caused tremendous financial, emotional, physical, and other losses and suffering. This action is brought by Jane Doe to recover monetary damages and to right some of the many wrongs he and they committed.

3. Plaintiff Jane Doe ("Plaintiff" or "Jane Doe") hereby brings this complaint against Defendants Daniel L. Peterson, M.D. ("Dr. Peterson"); Sierra Internal Medicine, Daniel L. Peterson, M.D., LTD. ("Sierra Internal Medicine"); Simmaron Research Inc. ("Simmaron"); and DOES 1 through 50, inclusive (individually "Defendant" and collectively "Defendants") as follows.

## PARTIES

### A.   Plaintiff Jane Doe

4. Plaintiff Jane Doe is an individual residing in Menlo Park, California. Jane Doe brings this suit under a pseudonym in order to protect her identity and privacy from disclosure as a healthcare patient and due to the intimate nature of the subject matter of this dispute.

### B.   The Defendants

5. Defendant Daniel L. Peterson, M.D. is an individual licensed to practice medicine in both California and Nevada, residing at 749 Tyner Way, Incline Village, Nevada. Dr. Peterson is employed by Defendant Sierra Internal Medicine, Daniel L. Peterson, M.D., Ltd. as its President.

6. Defendant Sierra Internal Medicine, Daniel L. Peterson, M.D., Ltd. is registered as a professional corporation organized and existing under the laws of Nevada with its principal place of business in Incline Village, Nevada. Dr. Peterson serves as its President, Secretary, Treasurer, Director, and, upon information and belief, is its sole shareholder.

7. Defendant Simmaron is registered as a nonprofit corporation organized and existing under the laws of Nevada that was founded by Dr. Peterson. Dr. Peterson is also a member of Simmaron's Scientific Advisory Board.

8. The true names and capacities of DOES 1 through 50, inclusive, whether corporate, individual or otherwise, are presently unknown to Jane Doe, who therefore sues DOES 1 through 50 by such fictitious names, and will ask leave to amend her complaint to show their true names and capacities when ascertained.

### C.   Alter Ego

9. At all relevant times, as alleged more fully herein, each Defendant acted as an agent, employee, co-conspirator, and/or alter ego of the other Defendants, and in doing the things alleged

3
COMPLAINT

herein, acted within the course and scope of such agency, employment, conspiracy, alter ego and/or in furtherance of one another. Each of the Defendant's acts alleged herein was done with the permission, knowledge, and consent of the other Defendants.

10.    Defendants Sierra Internal Medicine and Simmaron were the alter egos of Defendant Dr. Peterson and, at all relevant times, there has been a unity of interest and ownership between Defendants such that any separateness between them ceased to exist. Dr. Peterson owned, controlled, dominated, managed, and operated the other Defendants to suit his convenience and without regard for corporate formalities.

11.    Dr. Peterson controlled the business affairs of Sierra Internal Medicine and Simmaron and manipulated the assets and liabilities of the entities. Dr. Peterson commingled the funds and assets of the corporate entities and diverted corporate funds and assets for his own personal use. He further disregarded legal formalities and failed to maintain an arm's length relationship with the entities. Additionally, he used many of the same offices, business locations, and employees for his medical practice and for these entities. Dr. Peterson used Sierra Internal Medicine and Simmaron as mere shells or instrumentalities for himself and his individual business. Dr. Peterson used the corporate entities to conceal their ownership, management, and financial interests and to shield himself against personal obligations, including the obligations alleged herein.

### D.    Agency, Aiding and Abetting, and Conspiracy

12.    Defendants, and each of them, were acting as the agents, employees, and/or representatives of each other and were acting within the course and scope of their agency and employment with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this herein.

13.    Defendants knowingly and wrongfully conspired with one another with respect to the conduct alleged herein. Defendants' wrongful acts in furtherance of the conspiracy included fraudulently inducing Jane Doe to pay Defendants money as well as the additional wrongful acts set forth herein. As a result of Defendants' conspiring with one another, Jane Doe has been harmed in an amount to be proven at trial.

14.     Defendants aided and abetted each other with respect to the wrongful conduct alleged herein, including fraudulently inducing Jane Doe to pay Defendants money.  As a result of Defendants' aiding and abetting one another, Jane Doe has been harmed in an amount to be proven at trial.

15.     Defendants are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over Dr. Peterson pursuant to California Code of Civil Procedure § 410.10.  Dr. Peterson's breaches of contract and his tortious and other unlawful activities described in this complaint were directed at Jane Doe, a California resident, and the harm he caused was suffered in California.  Further, Dr. Peterson maintains an active medical license from the Medical Board of California and treated Jane Doe on multiple occasions in California, both remotely (via phone and email) and in person at her home in Menlo Park, CA. Jane Doe also received bi-weekly infusions prescribed by Dr. Peterson at her home in Menlo Park, CA until March 2020.

17.     This Court has personal jurisdiction over Sierra Internal Medicine because, through its agents (including but not limited to Dr. Peterson), it participated in the contractual breaches and tortious and unlawful activities directed at a California resident described herein.  Further, Sierra Internal Medicine provided healthcare to Jane Doe, a California resident, remotely (via phone and email) and in person at her home in Menlo Park, CA.  Jane Doe also received bi-weekly infusions prescribed by Dr. Peterson at her home in Menlo Park, CA until March 2020.  This was done in the course of his business as a Sierra Internal Medicine employee.  Additionally Sierra Internal Medicine is owned, controlled, dominated, managed, and operated by Dr. Peterson, a California licensed doctor.

18.     This Court has personal jurisdiction over Simmaron because, through its agents (including but not limited to Dr. Peterson), Simmaron participated in the contractual breaches and

tortious and unlawful activities directed at a California resident described herein. These tortious activities, including making numerous false statements to Jane Doe in violation of the duty of care that Simmaron owed to her, resulted in extreme emotional and physical distress. Additionally Simmaron was founded by and is dominated and controlled by Dr. Peterson, a California licensed doctor.

19.   Venue is proper in San Mateo County because a substantial part of harm and injury suffered because of Defendants' contractual breaches and tortious and unlawful actions occurred in this County, where Jane Doe resides. Additionally, a portion of Jane Doe's healthcare provided by Defendants was delivered in San Mateo County. Venue is also proper in San Mateo County under Code of Civil Procedure § 395(a) because Defendants do not reside in California.

## GENERAL ALLEGATIONS

### E.   Jane Doe is Diagnosed with Myalgic Encephalomyelitis

20.   Plaintiff Jane Doe was a highly successful international business attorney when her career was taken from her by a disease that rendered her unable to function in her job. In 2006, she was diagnosed with Chronic Fatigue Syndrome ("CFS"), a serious, chronic, complex, and systemic disease that frequently and dramatically limits the activities of affected patients. She has been disabled ever since.

21.   CFS, often referred to as Myalgic Encephalomyelitis ("ME") or ME/CFS, is characterized by a significant decrease in function and debilitating symptoms both of which severely limit Jane Doe's ability to carry on even routine day-to-day activities and which are aggravated by any activity, whether physical, cognitive, or emotional. There is no cure or FDA-approved treatment for ME, and the CDC estimates that up to 2.5 million Americans suffer from the disease.

22.   Jane Doe suffers from a moderate-to-severe case of ME, which is an extremely poorly understood disease both by most medical professionals and by virtually all of the public. This pervasive misunderstanding leads to ignorance of the effects of the disease, both in terms of its severity and its persistence. Because ME is routinely and drastically minimized, many patients experience denial or medical neglect while they simultaneously suffer devastating losses of

careers, social relationships, and personal autonomy due to their inability to function reliably. Because of this, some background and explanation of the disease and the particular ways it affects Jane Doe are relevant to understand the Defendants' actions and their impact on Jane Doe.

23.    The Myalgic Encephalomyelitis International Consensus Criteria ("MEICC") published by experts who collectively had approximately 400 years of clinical and teaching experience, authored hundreds of peer-reviewed publications, and diagnosed or treated approximately 50,000 patients with ME.  As described by the MEICC, the symptoms produced by this acquired multi-system disease are numerous and reflect dysregulation of the affected systems. According to the MEICC, ME patients suffer from "marked, rapid physical and/or cognitive fatigability" (which is to be distinguished from fatigue) "in response to exertion, which may be minimal such as activities of daily living or simple mental tasks" as well as from a "low threshold of physical and mental fatigability (lack of stamina) result[ing] in a substantial reduction in pre-illness activity level."  In addition, ME patients experience extreme and unrelenting exhaustion; "neurological impairments" leading to cognitive difficulties such as "difficulty processing information," especially under time pressure, caused by "slowed thought and impaired concentration" ("*e.g.*, confusion, disorientation, cognitive overload, difficulty with making decisions, slowed speech, acquired or exertional dyslexia," poor processing speed, difficulty with multi-tasking), "short-term memory loss," ("*e.g.*, difficulty remembering what one wanted to say, what one was saying, retrieving words, recalling information, poor working memory"), and difficulty with expressive language (*e.g.*, dyslogia, the impaired ability to express ideas verbally). Headaches, significant pain in muscles, muscle-tendon junctions, joints, abdomen and chest, and generalized pain are common.  ME patients furthermore suffer from sleep disturbances such as "disturbed sleep patterns" ("*e.g.*, insomnia, prolonged sleep" typically in the acute stage, and reversal of sleep cycle typically in the chronic stage ("sleeping most of the day and being awake most of the night"), "frequent awakenings, awaking much earlier than before disease onset, and vivid dreams/nightmares"), and unrefreshing, ineffective, sleep ("*e.g.*, awaken feeling exhausted regardless of sleep duration, day-time sleepiness").  Moreover, "neurosensory and perceptual" disturbances ("*e.g.*, inability to focus vision, sensitivity to light, noise, vibration, odor, taste and

touch; impaired depth perception") as well as motor disturbances ("*e.g.*, muscle weakness, twitching, poor coordination, feeling unsteady on feet, and ataxia" (neurological symptoms involving lack of muscle control or coordination of voluntary movements, such as walking or picking up objects; difficulty with balance, walking, eating, and swallowing; gait abnormalities; tremors; slurred speech; and deterioration of fine motor skills)) are typical.  Other common symptoms include flu-like symptoms such as enlarged and tender lymph nodes, "sore throat, sinusitis," and body aches as well as other immune impairments like "susceptibility to viral infections with prolonged recovery periods."  "Energy production/transportation impairments" are typically present in ME patients, such as cardiovascular abnormalities ("*e.g.*, inability to tolerate an upright position—orthostatic intolerance, neurally mediated hypotension, and postural orthostatic tachycardia syndrome" (POTS) leading to blood pressure and heartrate changes upon being in an upright position, "palpitations with or without cardiac arrhythmias, light-headedness, dizziness") and respiratory abnormalities including "air hunger, labored breathing, and fatigue of chest wall muscles."  ME patients often experience a "loss of thermostatic stability" ("*e.g.* subnormal body temperature, marked diurnal fluctuations; sweating episodes, recurrent feelings of feverishness with or without low grade fever, cold extremities") and "intolerance of extreme temperature."  Gastro-intestinal tract abnormalities ("*e.g.* nausea, abdominal pain, bloating, irritable bowel syndrome") and genitourinary abnormalities ("*e.g.* urinary urgency or frequency, nocturia") are common in ME patients as well as "sensitivities to food, medication, odors, and chemicals," among other symptoms.  According to the MEICC, there "may be marked fluctuation of symptom severity and hierarchy from day to day and hour to hour."  ME is not characterized by fatigue but rather by the persistent expression of the profound and often severe, complex dysregulation of multiple bodily systems, including, but not limited to, the immune, neurological, cardiovascular, and endocrine systems; energy metabolism, production, and transport systems; the Hypothalamic-Pituitary-Adrenal ("HPA") axis; and other systems.

24.    ME patients also experience adrenaline surges triggered by overexertion, which activates the HPA axis.  Adrenaline surges allow an ME patient to temporarily display higher functionality but often result in a so-called crash when the patient's HPA axis does not correctly

down-regulate. A hallmark symptom of ME is called Post-Exertional Malaise ("PEM") or Post-Exertional Neuro-immune Exhaustion ("PENE"): a marked increase (with or without delay) of symptomatic severity that causes a pathologically long recovery time following any physical or cognitive exertion or the experience of other stressors, emotional or otherwise. In fact, a 2015 Institute of Medicine (now National Academy of Medicine) expert panel named the disease Systemic Exertion Intolerance Disease in a report for which Dr. Peterson served as an independent reviewer. PENE can exacerbate any or all of an ME patient's symptoms as well as cause other symptoms that can further decrease the patient's functional capacity for months and even cause permanent damage. PENE can be triggered by exertion and stressors that would barely affect those who do not suffer from ME, making the ups and downs of everyday life dangerous to ME patients' health. This is on top of the fact that ME patients experience significant symptoms and reductions in functional capacity regardless of whether they are in PENE.

25.   ME sufferers also experience exaggerated stress responses as a result of apparent damage to the HPA axis. Therefore, acute illness and/or injury, surgery, accidents, stress of any type (including what is commonly considered "good stress" such as excitement about a positive experience), and disruptions in carefully managed daily pacing of energy expenditure (*e.g.*, medical appointments involving preparation, travel to the appointment, and being upright and taking notes during the appointment; urgent home repairs; health or other problems concerning other family members) can be potentially exacerbating factors.

26.   Notably, ME patients may be able to perform an activity on one day that they are unable to reproduce on following days. This has been shown conclusively through research using two-day maximal cardiopulmonary exercise tests ("CPETs"). According to CPET experts, this objective test methodology ascertains maximal effort by the patient and therefore distinguishes between indolence and true disability. Two-day CPETs measure and evaluate functional capacity via peak oxygen consumption. Because ME patients' performance on the second day is significantly and often dramatically reduced compared to the first day of testing and because of their prolonged and severe PENE following exercise, researchers have questioned the ethics of

1   submitting patients to CPETs, despite the utility of results from two-day CPETs in diagnosing the

2   disease.

3       27.   By definition, ME is characterized by systemic dysregulation resulting in both

4   dramatic and long-term reduction in functional capacity. A "mild" case can reduce a patient's

5   functional capacity by approximately 50%. As levels of severity increase (from moderate to

6   severe and very severe), ME patients suffer from alarmingly reduced abilities (e.g., very severe

7   patients may need to be tube-fed and unable to leave their beds). At every level, physical,

8   cognitive, and emotional exertion typically aggravates adverse, limiting symptoms and debility.

9   Although some individuals with ME can and do continue working, typically part-time, they do so

10  by making other sacrifices such as completely eliminating other activities and severely restricting

11  social contacts. Many sufferers are disabled and unable to maintain employment; some require

12  consistent supportive care.

13      28.   In mild cases of ME, symptom exacerbation could be triggered by even small tasks,

14  such as taking a walk or vacuuming the house. An ME patient with a moderate case is mostly

15  housebound, and a brief trip to a loud, bright environment such as a store or restaurant by such a

16  patient could require days to weeks of rest to recover. A severe sufferer would be mostly

17  bedbound, rarely able to leave home for anything but medical appointments and, even at home,

18  any activity sustained for more than a brief interval could result in exacerbation. Very severe

19  patients are entirely bedridden, and simply having the lights turned on or being bathed or moved

20  from one bed to another could be catastrophic for them.

21      29.   ME patients typically become aware of their so-called "baseline" as a state that

22  defines their level of ability and around which there is slight variability. The less severe the ME,

23  the more success the patient might have in exceeding limits for a short time, but they will likely

24  nevertheless suffer physical repercussions in the form of increased symptom severity or negative

25  baseline shifts that could last weeks, months, or years. Any exertion beyond the patient's baseline

26  can trigger PENE.

27      30.   While some patients experience temporary remission of ME, research has shown

28  that most who consider themselves "recovered" still lead lives that are significantly restricted

compared to their pre-disease state; those patients typically have merely adjusted to their new baseline as opposed to being truly recovered. Recovery after five years of suffering from ME is exceedingly rare.

31.     Quality-of-life research shows that ME patients have poorer quality of life than people with other chronic illnesses, at times approaching that of patients undergoing chemotherapy or patients with end-stage renal failure or late-stage AIDS. According to Dr. Peterson, ME "is one of the most disabling diseases that [he] cares for, far exceeding HIV disease except for the terminal stages." ME produces a substantial level of disability in many patients, forcing patients to weigh their decisions about performing even simple tasks, such as deciding whether to bathe or prepare and eat a simple meal. Accordingly, ME patients typically limit their activities to brief periods of time and alternate with rest. Additionally, because people with ME must and do operate physically and mentally more slowly, many tasks take significantly longer. Accompanying these extreme limitations, ME patients also deal with the ongoing threat that exceeding their limits can cause so-called "flares" of symptom exacerbation and even downward baseline shifts, resulting in lengthy or even permanent further harm to their health.

32.     Jane Doe suffers from a majority of the aforementioned signs and symptoms. Prior to suffering from ME, Jane Doe was a high-functioning attorney who succeeded in working for extended periods of 12- to 14-hour days while also managing her affairs and enjoying an active personal life, performing requisite tasks with competency and ease. Her cognitive function was powerful enough that she passed the California Bar Examination on her first attempt in her second language, having learned English mostly in her late twenties in the two years prior to taking the Bar Examination, and after only one year at a US law school. Having ME altered Jane Doe's life almost beyond recognition, obliterating her ability to pursue her chosen career, severely reducing her ability to connect with family and friends, and curtailing even her ability to care for herself without support from her husband and paid assistants. In her current state, any activity outside very strict limits risks further deterioration of her condition.

33.     Jane Doe's current capacity hovers around 15% of her previous output; while on Ampligen, the principal experimental drug provided to her by Dr. Peterson, it was about 60 to

70%. To illustrate how this manifests, as with other ME patients, Jane Doe must take extreme care in managing her daily activity. Since her diagnosis, she has not been able to perform expected activities of daily living safely and many of her previous typical activities have become impossible, such as routine household maintenance like cleaning. Other tasks have to be adapted and/or broken down into small steps (*e.g.*, putting a few dishes in the dishwasher) before weakness, nausea, pain, and a general feeling of severe unwellness force her to sit or lie down. Jane Doe cannot stand for extended periods of time and must sit to perform even simple tasks, such as sitting to brush her teeth and using a shower chair on the days when she is strong enough to bathe. On a rare "good" day, she is able to sit up for 15 to 20 minutes to eat at the table with her husband and child. Jane Doe's husband does most of the housekeeping, laundry, animal care, and food preparation, which makes it possible for Jane Doe to organize their child's schedule and address a few of the household needs that are less physical, such as ordering supplies online, all of which she does lying down.

34.     Additionally, ME impacts Jane Doe's cognitive functions. She must lie down while engaging in cognitive activities with her legs extended and supported. Sitting upright at a desk with her feet on the floor has an immediate and deleterious impact on her ability to concentrate and also triggers or worsens her physical symptoms.

35.     The report for Jane Doe's two-day CPET, which she underwent at a time when her health was better than it currently is, demonstrates objectively the impairment of her functional capacity. Jane Doe's assessed measures of reproducibility, metabolic responses (oxygen consumption), workload, cardiovascular responses, pulmonary function, and recovery responses were significantly abnormal. All abnormal areas were impacted in ways sufficient to "severely limit her ability to engage in normal activities of daily living and preclude full-time work of even a sedentary/stationary nature." To illustrate the severity of the impairment, it is important to understand that in generally healthy individuals as well as in patients with cardiac, pulmonary, and metabolic disease, the variability of their CPET results day to day is less than eight percent. This means that those individuals can generally reproduce on day two their results from day one within an eight-percent window. In contrast, Jane Doe experienced a 26% drop in her metabolic

responses, a 58% drop in her workload, and a 26% drop in her pulmonary function, all on day two compared to day one of her two-day CPET.  Further, Jane Doe's oxygen consumption for day two was 39% of the predicted value according to the report, meeting the New York Heart Association criteria for moderate (borderline severe) functional impairment.

36.    Furthermore, according to the report, "[m]ost activities of daily living (reading, walking at a normal pace, computer use, office-type work, etc.) are aerobic in nature and healthy individuals are able to perform such activities for prolonged periods of time...." If the anaerobic threshold (the point above which activity requires energy production derived from anaerobic sources, thereby limiting the duration at which activity can be maintained without triggering a prolonged recovery) occurs at low oxygen consumption, energy production requires anaerobic metabolism and normal daily activities cannot be sustained or trigger a prolonged recovery period. Due to Jane Doe's early-onset anaerobic threshold of 8.6 ml kg$^{-1}$ min$^{-1}$ and her reduced work efficiency of 58% on day two, indicating moderate to severe metabolic impairment, "[m]any normal activities of daily living would severely tax [Jane Doe]'s capacity to produce energy aerobically.  Oxygen demands for tasks such as driving a car, showering, or climbing stairs fall in the range of 10.5 to 14 ml kg$^{-1}$ min$^{-1}$," which is above Jane Doe's anaerobic threshold making it likely that she will experience "onset/exacerbation of symptoms" following such activity.

37.    Because of this devastating impact, Jane Doe sought care with Dr. Peterson.

**F.    Dr. Peterson Begins Treating Jane Doe's ME**

38.    Defendant Dr. Peterson has treated patients suffering from ME for about 38 years and is one of the few physicians in the world who specializes in the disease.  Starting in 1998, Dr. Peterson has served as the principal investigator in FDA-approved clinical-trial studies on the treatment of ME patients with "Ampligen," an experimental immune-system modulator developed by Hemispherx Biopharma Inc. ("HEB"), now known as AIM Immunotech Inc.  Because Ampligen is an experimental drug and has not yet been approved by the FDA for the treatment of ME, or any other medical condition, the only way that ME patients can obtain and be treated with Ampligen is by participating in a clinical trial.

39.    In 2011, Jane Doe learned of the drug Ampligen and the ongoing "Open-Label Study of Poly I:Poly $C_{12}U$ (AMPLIGEN®) in Patients With Severely Debilitating Chronic Fatigue Syndrome (CFS)".[1] Upon information and belief, at that time, there were only four doctors in the United States administering Ampligen treatments for ME: Dr. Peterson in Incline Village, NV and three other physicians located in Charlotte, NC; New York City, NY; and Salt Lake City, UT. Having been unsuccessful in finding an effective treatment for her ME symptoms that would allow her to lead a somewhat normal life with her husband and young child, Jane Doe sought to enroll in the study at the Incline Village location.

40.    Jane Doe set up an appointment with Dr. Peterson in January 2012 to join the Ampligen study. Dr. Peterson recommended a one-year course of Ampligen for Jane Doe, which he claimed would be sufficient for her health to improve. On subsequent occasions, he even told her that he believed she would make "a full recovery." He made that same representation to her husband and parents.

41.    On or around February 28, 2012, Jane Doe entered into an agreement with Dr. Peterson and Sierra Internal Medicine under which Jane Doe would receive semi-weekly intravenous Ampligen infusions at Dr. Peterson's office as part of the clinical trial. Defendants were able to adjust Jane Doe's infusion schedule to accommodate her travel, allowing her to receive treatments on days other than the regular infusion days, including on weekends and holidays, when her health or her travel circumstances necessitated it.

42.    Less than two months later, in April 2012, Jane Doe received her first Ampligen infusion from Dr. Peterson. At that time, Dr. Peterson also became Jane Doe's primary care physician. Initially, Dr. Peterson started treating Jane Doe with 25 mg of Ampligen during each semi-weekly infusion, which he gradually increased over the course of many months until she reached the full dose of 400 mg (*i.e.*, two 200 mg bottles of Ampligen).

43.    Due to the experimental nature of Ampligen, the medication was not covered by health insurance or Medicare. Accordingly, Jane Doe was personally responsible for paying for

---

[1] Protocol Number: AMP-511.

her supply of Ampligen. She would purchase her Ampligen from manufacturer HEB through Sierra Internal Medicine, which would provide her with copies of the purchase orders. During that time, Jane Doe was purchasing two-months' supplies of Ampligen at the FDA-approved price of $75 per bottle. Extrapolated out, the yearly cost for the full dose of Ampligen according to the study protocol of two Ampligen bottles (400 mg) twice per week was $15,600.

44.     Sierra Internal Medicine was also responsible for storing and administering the drug, under the supervision of Dr. Peterson. Sierra Internal Medicine's would store Jane Doe's bottles in a section reserved for her supply in the refrigerator designated for the storage of Ampligen, which was located in Sierra Internal Medicine's locked lab.

45.     Around the summer of 2013, Dr. Peterson began treating Jane Doe with Intravenous Immunoglobulin ("IVIG") in addition to Ampligen. Dr. Peterson also added saline to some of her infusions. These additional infusions initially took place at Dr. Peterson's office, but in or around December 2015, Jane Doe began receiving bi-weekly home infusions of IVIG (and later also saline) prescribed by Dr. Peterson at her home in Menlo Park, California.

46.     For five years in the Ampligen trial, Jane Doe's health improved significantly. In fact, for a brief period of time between July and November 2015, on the advice of a different physician, Jane Doe discontinued her treatment with Ampligen. Her condition significantly deteriorated, confirming for Jane Doe that Ampligen was a life-changing drug. Indeed, Jane Doe's health had improved enough while she was receiving the Ampligen treatment that she was able to become a prominent patient advocate for ME and Ampligen while she was on the drug.

G.     **Defendants Begin Mismanaging the Ampligen Clinical-Trial Study**

47.     Beginning in or about 2015, Defendants' performance of their responsibilities for the Ampligen clinical trial began to worsen. For instance, Sierra Internal Medicine, which was responsible for ordering Ampligen for Jane Doe, stopped placing orders when Jane Doe's supply was running low. Jane Doe was forced to begin tracking her supply of Ampligen and actively make sure Sierra Internal Medicine was placing the appropriate orders for her so that she did not run out of medication. Sierra Internal Medicine also failed to follow other protocol requirements,

1  such as providing Jane Doe with lab orders and questionnaires and notifying her of deadlines for

2  Ampligen physicals, EKGs, and other requirements.

3      48.   Defendants also stopped providing Jane Doe purchase orders for her Ampligen.

4  Instead, Sierra Internal Medicine—and later Simmaron, which had begun administering some of

5  Sierra Internal Medicine's clinical trial-coordination responsibilities—begun unilaterally charging

6  Jane Doe's credit card on file for Ampligen without providing her with documentation.

7      49.   Jane Doe raised her concerns about Defendants' management of the clinical trial

8  with Defendants, but did not receive a response.  Jane Doe was fearful that if she insisted that

9  Defendants address her concerns, Defendants would retaliate and eject her from the clinical trial.

10 Indeed, according to the various Institutional Review Board ("IRB") approved consent forms Jane

11 Doe signed, Dr. Peterson had discretion to remove her from the clinical trial for any reason:

12         Your Study Doctor and/or the Sponsor have the right to withdraw you from the
           study, without regard to subject consent, at any time if required, for example,
13         by a change in your medical condition, withdrawal of approval of this study, a
           change in the protocol duration, failure to comply with the dosing and testing
14         requirements of the protocol, use of prohibited medications or other reasons.

15

16 True and correct copies of consent forms are attached hereto as **Exhibits A and B**.

17     50.   Starting in or around June 2016, without explanation, Defendants reduced Jane

18 Doe's Ampligen orders to once a month from the bi-monthly orders she had previously received.

19 Defendants did not explain why Jane Doe's orders had been reduced; however Jane Doe later

20 learned that HEB was experiencing an Ampligen inventory shortage.  Defendants failed to inform

21 Jane Doe of this supply issue, and Jane Doe was forced to ration her Ampligen, taking half doses

22 (*i.e.*, 200 mg) instead of her full prescribed dosage (*i.e.*, 400 mg) and missing infusions.

23 **H.    Jane Doe is Unable to Purchase Ampligen Due to a Supply Shortage**

24     51.   In early December 2016, Jane Doe discovered, purely coincidentally, that her

25 Ampligen supply had dwindled to one bottle.  Defendants had not notified her that her supply was

26 low, nor had they informed her of the Ampligen shortage.  Concerned for her health, she sent Dr.

27 Peterson an email in early December inquiring about the status of her order of Ampligen for

28 December.  Dr. Peterson did not reply.  Jane Doe believed at the time that Defendants had failed

1  to properly purchase her medication, but felt she could not raise the issue out of fear that Dr.

2  Peterson would eject her from the trial in retaliation.

3      52.    By mid-January 2017, Jane Doe had completely exhausted her supply of Ampligen.

4  Defendants told Jane Doe that they could provide her with infusions with bottles of Ampligen in

5  their possession from past trial participants who had purportedly donated their extra bottles.

6  Although Jane Doe was uncomfortable using Ampligen that had been purchased by other patients,

7  she very much wanted to continue her treatment and, after obtaining assurances from HEB and

8  Simmaron that proper consent had been obtained from the donating patients, she agreed to accept

9  the donated bottles.

10      53.    In February 2017, Dr. Peterson represented to Jane Doe that the bottle price of

11  Ampligen was going to be increased from $75 to $400.  While this significant increase came as a

12  shock to Jane Doe and the other Incline Village Ampligen patients, Jane Doe accepted Dr.

13  Peterson's representations as true.  However, Jane Doe later learned that the FDA had authorized a

14  price increase for Ampligen from $75 to $200—not $400 as Dr. Peterson had misrepresented.

15      54.    Around the same time, rumors began circulating that the Ampligen trial was at risk

16  of being terminated and that there would be no additional Ampligen supply.  These rumors created

17  a high level of distress and fear among the Ampligen patients at the Incline Village clinic,

18  including Jane Doe.  Accordingly, in February and March 2017, Jane Doe sent emails to HEB

19  requesting an update on the status of the Ampligen clinical trial.  HEB's General Counsel

20  responded that HEB typically does not communicate directly with patients, but nonetheless

21  responded:

22          Last year there was an inventory shortage while the new batch of Ampligen was
23          being manufactured at our contract manufacturer.  This information was
        communicated to all clinical sites.  That product has since become available for
24          clinical patient use.  We also made changes to the clinical study design which
        was also communicated with the clinical sites.

25

26      55.    While Jane Doe had heard rumors of protocol changes, HEB's email was the first

27  time she learned of the Ampligen inventory shortage, which had been causing the supply issues.

28

I. **Defendants Make False Promises to Purchase and Supply One Year's Worth of Ampligen for Jane Doe**

56. Even after her months of cautious rationing, on March 13, 2017, Jane Doe was infused with the last of the donated bottles of Ampligen. Between January and March 2017, instead of the approximately 10,600 mg of Ampligen she should have received, Jane Doe received only approximately 2,800 mg. During this time, she experienced a marked decline in her health, and she was eager to resume her regular Ampligen treatment to support her rapidly deteriorating health.

57. The same day as Jane Doe's last infusion of donated Ampligen, Dr. Peterson approached her with a proposal. He represented to Jane Doe that Defendants could procure and sell to her a full one-year supply of Ampligen that would be stored at Defendants' office and set aside exclusively for her use if she would prepay the full amount up front, as opposed to purchasing bi-monthly or monthly supplies from HEB. Dr. Peterson also assured her that Defendants would refund her for any unused bottles of Ampligen should she exit the program or choose not to use all of the medication for any reason, which was consistent with the consent form agreement she had signed with Defendants in the past. Dr. Peterson represented to Jane Doe that, by purchasing the Ampligen from Defendants, she would be guaranteed a steady supply of Ampligen and protected against future supply shortages.

58. Dr. Peterson offered to sell Jane Doe the one-year supply of Ampligen at the price of $200 per bottle. Jane Doe required approximately 208 bottles per year, so her one-year supply would cost $41,600. Although prepaying $41,600 in a lump sum was a substantial investment, in light of the hardship, suffering, and uncertainty Jane Doe had experienced during the Ampligen shortage and in reliance on Dr. Peterson's promises that he could deliver this supply of Ampligen and his commitment that Defendants would refund any unused amounts for any reason, Jane Doe accepted Dr. Peterson's offer to purchase the one-year supply of the Ampligen from Defendants. Cynthia Dooley, Dr. Peterson's and Sierra Internal Medicine's Medical Records Manager, confirmed the order for a one-year supply of Ampligen and charged Jane Doe's credit cards for $41,600.

59.     The next day, Jane Doe emailed Simmaron to confirm her purchase of a one-year supply of Ampligen from Defendants for $41,600.  Simmaron confirmed the agreement on March 15, 2017 and, two days later, sent Jane Doe a new consent form agreement, which provided that any of the unused medication she purchased would be fully refundable: "Upon discontinuation from the study, any unused investigational study medication will go back into the study drug inventory and you will be refunded the original purchase price of the unused investigational study medication."  The consent form, like the prior consent forms she had signed, also required that Jane Doe submit to a chest x-ray and physical with Dr. Peterson if she were to exit the study.  Upon information and belief, Dr. Peterson and Sierra Internal Medicine co-signed the consent form.  A true and correct copy of the consent form is attached hereto as **Exhibit B.**

60.     In April 2017, Dr. Peterson told Jane Doe: "we received a very large shipment of Ampligen yesterday most of which is yours."  Naturally, this caused Jane Doe to believe that Defendants had obtained her one-year supply of Ampligen.  That same day, Jane Doe received her first infusion from what she believed to be her one-year supply, after having not received any infusions for a month.

**J.     HEB Suspends Dr. Peterson's Clinical Trial Site for Protocol Violations**

61.     On May 17, 2017, just two months after Jane Doe purchased her one-year supply of Ampligen from Defendants, Defendants informed Jane Doe that infusions would be suspended until the conclusion of a HEB site visit scheduled for the following week.  Following the HEB site visit, HEB put a hold on the clinical study at Incline Village, effective May 26, 2017, extending the suspension of infusions.  Upon information and belief, it was not a hold on the trial itself, but a hold on Dr. Peterson as a site investigator for the trial due to serious protocol violations by him and his alter ego companies.  At that time, Jane Doe had received approximately seven of the 208 single-bottle Ampligen doses for which she had prepaid.  She believed the remaining approximately 200 bottles were now in limbo, owned by her but unavailable for her use due to the suspension.  Jane Doe's health, which had not yet recovered from the prior missed infusions and reduced doses, started to deteriorate further.

62.   Five months into the suspension, on October 22, 2017, Jane Doe received by email from Dr. Gunnar Gottschalk, a Research Manager at Simmaron, a letter of the previous day sent on behalf of Sierra Internal Medicine and Dr. Peterson.  In the letter, Defendants Sierra Internal Medicine and Dr. Peterson claimed for the first time that Dr. Peterson and Sierra Internal Medicine had only bought a four-week supply for Jane Doe and had not used her money to order the 208 bottles as promised.  They also falsely claimed that Jane Doe had only been charged for medication that she had used, which at that point was only approximately seven bottles, and reiterated her right to a refund:

> HEB has raised concerns that patients were miss-lead [sic] by myself with respect [sic] multiple issues, but most importantly those centered around the amount of drug that was purchased by individuals.  Per the protocol, we were only able to order the maximum of a four-week supply of the drug.  The money that you paid was not utilized for the purchase [sic] the April 2017 shipment.  **You have only been charged for each bottle that is infused.**  Fees collected for infusion costs were done so to defray the overhead that is no longer covered by HEB.  (Emphasis in original.)
> ...
> Importantly, if you choose to withdraw from this study you will be refunded based on the number of infusions you received promptly.

63.   The October 22 letter also demanded that Jane Doe sign an attestation falsely stating that she had only purchased a four-week supply of Ampligen at $200 per bottle:

> **I also disclose that I understand I have only purchased the first FOUR weeks of treatment at the FDA approved price of $200 dollars per bottle.**  Payments which exceeded the FDA approved bottle price represent the costs associated with infusion related services.  (Emphasis added).

True and correct copies of the email and the letter, including the attestation, are attached as **Exhibits C and D**.

64.   Of course, the facts set forth in the letter and attestation were false and Defendants knew it; months before, they had charged Jane Doe's credit cards $41,600 for a full-year's supply of Ampligen.  Jane Doe replied to Simmaron that she could not sign the attestation because Dr. Peterson had promised her that Defendants would purchase a one-year supply of Ampligen on her behalf in March 2017 and that Defendants charged her $41,600 for the purchase:

I am asked to acknowledge that I have purchased only "**FOUR** weeks of treatment" at $200 per bottle. I must point out that is not what Dr. Peterson and I agreed upon, as was clearly confirmed in writing. We agreed that I was purchasing 208 bottles of Ampligen (a year's supply) at $200 per bottle and, in fact, I paid Sierra Internal Medicine $41,600 for this purpose. I understand that I was buying the drug from Dr. Peterson who in turn was buying it from Hemispherx. I was told this would facility [sic] my getting the drug on a long-term basis. I was further assured that most of the "very large" April 2017 shipment of Ampligen represented the bottles I had purchased. I did not understand or agree that any of the $41,600 I paid for Ampligen was for infusion or overhead cost. (Emphasis in original.)

65.    In response, Dr. Gottschalk disclosed that Dr. Peterson was subject to an IRB determination of serious non-compliance for failing to comply with protocol requirements. He further represented that the rest of Jane Doe's money was being held in an escrow account, but did not disclose any information about the account or under whose name the account was being held.

66.    Through these exchanges, Jane Doe learned for the very first time that Defendants had not obtained a full one-year supply of Ampligen as Defendants had promised, but instead had potentially only purchased a four week supply (*i.e.*, 20 bottles) of Ampligen for her, of which Jane Doe had only used seven bottles. Defendants' failure to purchase Jane Doe's one-year supply of Ampligen was highly distressing to Jane Doe. However, Jane Doe was caught in a bind: if she demanded an immediate refund, Defendants could eject her from the clinical trial, and she would lose access to Ampligen for the foreseeable future. Indeed, the October 22, 2017 letter also reinforced the precariousness of her situation, stating: "In the current state of the protocol, withdrawing from this study will prevent access to the drug indefinitely."

67.    Jane Doe still did not agree to sign the attestation on the basis that it was inaccurate but chose to remain in the study based on Simmaron's assurance that Dr. Peterson (or one of his entities) was holding her funds in escrow to be used as the drug was administered to her.

### K.    Defendants Resume the Ampligen Study

68.    In or around February 2018, HEB lifted the clinical-study suspension at the Incline Village site. In May 2018, Glenda Hill, Business Manager at Sierra Internal Medicine and Executive Director of Simmaron, informed Jane Doe that Defendants "now have ample supply

1   available to purchase in order to continue the clinical trial" with Ampligen from which they would

2   be ordering and that all bottles will be "barcoded and dosed ONLY to [Jane Doe]." In the same

3   communication, Sierra Internal Medicine again committed to keeping Jane Doe's funds in a

4   "separate patient account established strictly for Ampligen." The email further indicated that Dr.

5   Gottschalk of Simmaron would be handling the accounting and ordering for the trial.

6       69.    Defendants also notified Jane Doe that infusion days would no longer be flexible

7   and that infusions could take place only on Mondays and Thursdays. Jane Doe informed

8   Simmaron that she could not commit to the fixed infusion schedule because she lived over 200

9   miles from the trial site and the current state of her health and the unpredictable weather in the

10   Lake Tahoe area made travel to Incline Village unpredictable or impossible. Having been off of

11   Ampligen for a year, Jane Doe's health had deteriorated back to its pre-Ampligen state and

12   frequent travel from her home in California was out of the question. Furthermore, being away

13   from home was no longer an option due to her changed family circumstances.

14       70.    In response, Dr. Gottschalk told Jane Doe that, if she remained in the trial, after an

15   initial period of strict compliance, the rules around the infusion schedule and other trial

16   requirements would again be relaxed either through protocol revisions or protocol deviations

17   approved by Dr. Peterson and that Defendants could accommodate Jane Doe. Dr. Gottschalk

18   further represented that Defendants believed there was the potential for Jane Doe to eventually

19   receive Ampligen infusions at her home in California if she stayed in the trial.

20       71.    Relying on the promise of future flexibility, including the prospect of home

21   infusions, and repeated assurances that she would be fully refunded for any unused Ampligen (and

22   that her money was being kept in a separate escrow account), Jane Doe agreed to remain in the

23   clinical trial despite knowing that it might take months or longer before she would gain actual

24   access to Ampligen treatment again.

25   **L.    Defendants Refuse to Refund Jane Doe for the Unused Ampligen and Secretly
           Remove her from the Trial**

26

27       72.    Over the next two years, neither a relaxation of infusion scheduling nor the home-

28   infusion opportunity materialized. Accordingly, on July 28, 2020, Jane Doe requested a refund of

the prepaid money for the unused Ampligen. Dr. Peterson responded that Defendants would conduct an audit and assured her that she was still enrolled in the trial: "We have a very strict accounting with the pharmaceutical company and the fda [sic]. I will have the staff audit everything and let you both know. Ampligen is being used in conjunction with other modalities for endometriosis and cancers as well as corona. [Jane Doe] still has her slot and alottment [sic]."

73. Despite Defendants' promise to "audit" their records, they never produced any audit results and did not refund Jane Doe's money. Between July 28, 2020 and January 7, 2022, on three separate occasions Jane Doe—either on her own behalf or through her husband—emailed Dr. Peterson requesting a refund for the approximately 200 bottles of Ampligen that she had not been able to use, valued at $40,200. Dr. Peterson responded to these emails by representing that he and his staff members, bookkeeper, and Certified Public Accountant ("CPA") would "work on" Jane Doe's refund. Yet no refund ever materialized.

74. On February 4, 2022, Jane Doe's husband emailed Dr. Peterson on Jane Doe's behalf, yet again requesting the money Jane Doe paid for Ampligen that she did not receive and informing Dr. Peterson that Jane Doe would pursue her legal remedies if he did not refund the funds by February 18, 2022. Defendants did not respond and, when this deadline passed, it was clear that Defendants had no intention of returning Jane Doe's money as promised.

75. On March 3, 2022, Jane Doe learned for the very first time from that Defendants had ejected her from the Ampligen clinical trial. Jane Doe never withdrew herself from the study, and she believed up until this time that she continued to be a study participant allowed by Defendants to remain in the study until home infusions or flexible infusion days were established. Upon information and belief, Defendants ejected her secretly, without notice to her, from the study either in retaliation for her demand to return the prepaid money for her unused Ampligen or in an attempt to deter her from requesting a refund bolstered by Dr. Peterson's representation that she still had her "slot" in the trial and her "alottment" [sic] of Ampligen. Jane Doe has never received formal notice from Defendants or HEB that she was removed from the study, nor does she know when Defendants had her removed, and she, of course, has not received a refund.

76.     Indeed, in an apparent effort to conceal the fact that Defendants had removed her from the program and had stolen her money either in retaliation for her demands or to deter her from pursuing legal avenues to obtain the refund she was entitled to, Defendants also failed to follow the clinical trial exit protocol, which required Defendants to order a chest x-ray and have a physical of Jane Doe performed by Dr. Peterson, the principal investigator, at the end of her participation.  Indeed, this was an express requirement of the study protocol and the IRB-approved consent form signed by Jane Doe and all other study participants, as well as, upon information and belief, by Defendants.

77.     On March 7, 2022, a "special-projects" contractor for Sierra Internal Medicine called Jane Doe's husband claiming that Dr. Peterson was out of town but would send Jane Doe a check together with a "reconciliation" upon his return.  Sierra Internal Medicine again did not disclose that Jane Doe had been ejected from the trial, and Dr. Peterson never refunded Jane Doe's money.

78.     Defendants have been on notice of Jane Doe's demand since July 2020 when she first requested a refund for the prepaid Ampligen she had not received.  On numerous occasions, Defendants stated that they were investigating Jane Doe's request, conferring with specialists, such as a bookkeeper and a CPA, and would provide a refund as confirmed by Defendants' books and records.

## FIRST CAUSE OF ACTION

### (Fraud Against All Defendants)

79.     Jane Doe hereby incorporates by reference paragraphs 1 through 78 above, as though fully set forth herein.

80.     Defendants made numerous oral and written misrepresentations to Jane Doe, a California resident, including, but not limited to, those set forth above, knowing those statements were false or with reckless disregard as to their truth or falsity.  In making these representations, Defendants intended to induce reliance by Jane Doe on those representations and, indeed, Jane Doe justifiably relied on Defendant's misrepresentations.

81.    For example, in March 2017, Dr. Peterson represented to Jane Doe that Jane Doe could purchase a one-year supply (*i.e.*, 208 bottles of Ampligen) directly from Defendants to avoid any future Ampligen shortages if Jane Doe would prepay Defendants for the full amount of $41,600. Dr. Peterson further represented that Defendants would store Jane Doe's entire supply and reserve her bottles exclusively for her use and that any unused Ampligen would be refunded. Dr. Peterson made these false representations to induce Jane Doe to pay $41,600 to Defendants and remain in the Ampligen trial, which she did.

82.    At the time Dr. Peterson made the offer, he knew that Defendants could not procure the one-year supply of Ampligen for Jane Doe or made the representation with reckless disregard of its truth. Indeed, upon information and belief, Dr. Peterson knew that Defendants could not fulfill this promise because the manufacturer of Ampligen allowed Defendants to purchase only 20 bottles per patient at a time.

83.    Similarly, Cynthia Dooley at Sierra Internal Medicine represented to Jane Doe that Defendants were accepting her payment of $41,600 in exchange for a one-year supply of Ampligen and accepted her payment, knowing that Defendants could not fulfill this promise or with reckless disregard for the truth. Sierra Internal Medicine made the representation to induce Jane Doe to pay Defendants $41,600 and remain in the Ampligen trial, which she did.

84.    Additionally, after Jane Doe paid Defendants the $41,600, Marie Norell at Simmaron acknowledged receipt of Jane Doe's payment for the purchase of a one-year supply of Ampligen and represented her intention that Defendants would "place the order" the following week, knowing, or with reckless disregard for the truth, that Defendants could not obtain 208 bottles of Ampligen they had promised and further concealing Defendants' fraud. Additionally, both before and after Jane Doe made her purchase, Simmaron provided her with an updated consent form to sign, which promised her a refund of the original purchase price for any unused study medication if she left the study. Simmaron provided this form knowing, or with reckless disregard for the truth, that Defendants had no intention of ever returning Jane Doe's money.

85.    Defendants made these representations intending to induce Jane Doe to pay them $41,600 in reliance on their promise to purchase 208 bottles of Ampligen, and she had no reason

1  to doubt these representations.  At the time Jane Doe agreed to pay Defendants for a one-year

2  supply of Ampligen, Jane Doe was unaware that Defendants could not fulfill their promise due to

3  the fact that HEB allowed the purchase of only 20 bottles per patient at the time.  Had Jane Doe

4  known the truth and absent these misrepresentations, she would not have agreed to make this

5  payment.

6      86.    Between March 2017 and October 2017, Jane Doe was unaware, and could not have

7  discovered with reasonable diligence, that Defendants had not purchased the Ampligen supply as

8  promised.  In fact, Dr. Peterson represented to Jane Doe that Defendants had "received a very

9  large shipment of Ampligen" most of which, he claimed, was hers.  On October 22, 2017, she

10  learned for the first time that Defendants had not obtained a full one-year supply of Ampligen for

11  her, as promised.

12      87.    When Jane Doe learned that Defendants had not, in fact, purchased all of her

13  Ampligen as promised, Defendants made false or intentionally misleading representations to Jane

14  Doe to further their continued fraud.  Dr. Gunnar Gottschalk at Simmaron claimed that Defendants

15  had the remaining amounts of Jane Doe's funds in escrow.  In May 2018, Simmaron and Sierra

16  Internal Medicine again represented to Jane Doe that Defendants had set aside her prepaid funds

17  in a separate patient account, again falsely reassuring her that her money was safe and that she

18  would be reimbursed for any Ampligen she did not use.  They further represented that they would

19  be ordering for Jane Doe from the "ample supply" of Ampligen now available and that Jane Doe's

20  medication would be "barcoded and dosed ONLY to [Jane Doe]."  Defendants made these

21  misrepresentations with the intent that Jane Doe rely on the representations, remain in the clinical

22  trial, and not resort to other avenues to recover her money, such as filing a lawsuit.

23      88.    Simmaron further falsely represented to Jane Doe that, if she stayed in the clinical

24  trial, the infusion scheduling would eventually become flexible and she would be able to resume

25  infusions that accommodated her health and ability to travel.  Simmaron further told Jane Doe of

26  the prospect receiving Ampligen infusions at her home in Menlo Park, California.  Relying on

27  these statements, Jane Doe agreed to remain in the clinical trial and did not request an immediate

28  refund for her unused Ampligen.

89.     When Defendants' promises of a relaxed infusion schedule and home infusions did not materialize for two years, Jane Doe requested, in July 2020, June 2021, and January 2022, a refund for the Ampligen she had prepaid but not used.  In response to each of these requests, Dr. Peterson, on behalf of himself, Sierra Internal Medicine, and Simmaron, told Jane Doe that he was looking into her request or otherwise taking steps to issue her a refund, but he did not follow through.

90.     In a further effort to conceal Defendants' fraud—either to deter Jane Doe from seeking legal recourse in pursuit of a refund of the prepaid funds or in retaliation for Jane Doe's requests for a refund—Dr. Peterson secretly ejected Jane Doe from the Ampligen clinical trial. Defendants did not inform Jane Doe of this status change despite their fiduciary obligations to do so.  In fact, Dr. Peterson also falsely told Jane Doe that she still has her "slot" in the trial and "alottment" [sic] of Ampligen as of July 2020.  Jane Doe relied on Dr. Peterson's misrepresentations and believed that she was still enrolled in the study, still had her Ampligen allotment, and that Defendants would facilitate a refund for her, allowing Defendants to continue to retain wrongful possession of Jane Doe's property, which was a substantial factor in causing damages to Jane Doe.

91.     Dr. Peterson, as a researcher and clinician treating this vulnerable patient population, knew how serious and potentially long-lasting the impact, injury, and distress of these ongoing bad acts and misrepresentation would be on Jane Doe.

92.     Defendants' acts alleged herein were willful, wanton, malicious and oppressive and, therefore, justify awarding exemplary and punitive damages.

93.     As a direct and proximate result of Defendants' intentional misrepresentations and omissions, Jane Doe has suffered, and will continue to suffer, emotional, physical, psychological, and monetary damages in an amount to be proven at trial.

94.     WHEREFORE, Jane Doe prays for judgment against Defendants as set forth below.

## SECOND CAUSE OF ACTION

### (Breach of Written Contract Against All Defendants)

95.   Jane Doe hereby incorporates by reference paragraphs 1 through 94 above, as though fully set forth herein.

96.   In the alternative, Defendants breached their contractual obligations to Jane Doe.

97.   On or around March 8, 2017, Simmaron sent Jane Doe an agreement with Simmaron and Dr. Peterson relating to her participation in Ampligen clinical trial administered by Defendants, which agreement included a term that Defendants would refund Jane Doe for any unused Ampligen she had purchased.

98.   On March 13, 2017, Dr. Peterson made an oral offer that Defendants would purchase a one-year supply of Ampligen for Jane Doe's exclusive use, consisting of 208 bottles, in exchange for $41,600.  Jane Doe accepted the offer and, that same day, paid Sierra Internal Medicine $41,600 for the 208 bottles of Ampligen.

99.   The next day, on March 14, 2017, Jane Doe memorialized in writing the material terms of the parties' agreement in an email to Simmaron, the company responsible for procuring Ampligen from the manufacturer on behalf of Defendants.  Specifically, Jane Doe confirmed in writing that Defendants would purchase 208 bottles of Ampligen, at a price of $200 a bottle, for a total cost of $41,600; that this order would be included in the order that Simmaron was in the process of submitting to HEB; and that Jane Doe would be able to return any unused bottles, at her discretion, for a full refund.  Jane Doe also informed Simmaron that time was of the essence, as she had run out of Ampligen and her health had started to deteriorate.  Simmaron acknowledged and did not dispute Jane Doe's written memorialization of the agreement with Defendants.

100.   On March 17, 2017, at the instruction of Simmaron, Jane Doe executed an additional written instrument with Simmaron and Dr. Peterson relating to her participation in Ampligen clinical trial administered by Defendants, which again confirmed that Defendants would refund Jane Doe for any unused investigational study medication.  **Exhibit B**.  Upon information and belief, the form was later countersigned by Simmaron and Dr. Peterson.

101. In reliance on Defendants' promise to provide a one-year supply of Ampligen exclusively for her use, Jane Doe incurred reasonable expenditures in preparation for Defendants' performance of the agreement, including by purchasing a non-refundable annual $28,200 membership to Surf Air, a private membership airline, to facilitate her travel to the Incline Village clinic for Ampligen infusion appointments.

102. Jane Doe and Defendants had valid oral and written agreements that Defendants would purchase, store, and provide a one-year supply of 208 bottles of Ampligen to Jane Doe for her exclusive use and that they would refund Jane Doe for any amounts not used.

103. Jane Doe duly performed or satisfied all terms, conditions, promises, and obligations required to be performed or satisfied by her in accordance with the parties' under these agreements.

104. Defendants breached their agreements in 2020, 2021, and 2022 when they failed to perform their obligations under the agreements by refunding Jane Doe for the approximately 200 bottles of Ampligen that Jane Doe did not use, denying her of the benefit of the bargain.

105. Additionally, Defendants further breached their agreement with Jane Doe by failing to store and maintain Jane Doe's Ampligen bottles exclusively for her use. Defendants purchased at least 20 bottles and as many as 208 bottles of Ampligen using Jane Doe's funds for her exclusive use, of which she used only seven bottles. In February 2022, Jane Doe learned that Defendants are no longer storing any bottles of Ampligen for her and, thus, have improperly used or otherwise disposed of at least 13 bottles and as many as 201 bottles of Ampligen that were meant for Jane Doe's exclusive use and in violation of the parties' agreements.

106. In addition to this financial harm, due to the extreme and outrageous nature of Defendants' conduct in breaching their contractual obligations, Defendants caused Jane Doe to suffer severe emotional distress. Due to Defendants' doctor-patient and trial administrator-patient relationships with Jane Doe and their extensive knowledge of and experience with ME, they were aware of the extreme toll that their actions and failure of performance would have on Jane Doe. Because Defendants' medical practice and research institute is built around trying to improve the understanding of ME as well as the treatment and quality of life of patients suffering from ME,

they knew how serious and potentially long-lasting the impact of this ongoing distress would be to Jane Doe. Nevertheless, they engaged in this wrongful conduct, knowing of the likely consequences of their actions.

107. As a direct and consequential result of Defendants' material breaches of their contracts with Jane Doe, Jane Doe has suffered and continues to suffer monetary and emotional damages in an amount to be proven at trial but, at a minimum, in the amount of $68,400.

108. WHEREFORE, Jane Doe prays for judgment against Defendants as set forth below.

## THIRD CAUSE OF ACTION

### (Conversion Against Dr. Peterson and Sierra Internal Medicine)

109. Jane Doe hereby incorporates by reference paragraphs 1 through 108 above as though fully set forth herein.

110. In the alternative, through fraud and false pretenses, Defendants Dr. Peterson and Sierra Internal Medicine took possession of and wrongfully retained Jane Doe's money, to which they were not entitled and had no rightful claim, and concealed this wrongful taking from her.

111. At all times relevant hereto, Jane Doe was and is the rightful owner entitled to return of the $40,200 in payments made to Defendants Dr. Peterson and Sierra Internal Medicine.

112. At the time Defendants Dr. Peterson and Sierra Internal Medicine took wrongful possession of Jane Doe's money, they knew or should have known that the money belonged to her.

113. Defendants Dr. Peterson and Sierra Internal Medicine have not returned any portion of the payments made by Jane Doe despite her requests, retaining these funds without her consent to her detriment.

114. Jane Doe was unaware, and could not have discovered with reasonable diligence, that Defendants Dr. Peterson and Sierra Internal Medicine had stolen her money under false pretenses because Defendants took affirmative steps to conceal the scheme and maintain their wrongful possession of the funds. For instance, Defendants made multiple representations that Defendants would and had purchased Jane Doe's one-year Ampligen supply with her money when, in fact, they had not. Both Simmaron and Sierra Internal Medicine were well aware of

these facts but concealed them from Jane Doe; they also misrepresented to Jane Doe that her money was being held in a separate escrow account specifically designated for Ampligen. Furthermore, Dr. Peterson represented to Jane Doe that she still had her "slot" in the trial and her "alottment" [sic] of Ampligen (either falsely because he had already evicted her from the trial or in an effort to deter her from pursuing a refund). He also falsely represented to Jane Doe that he, his staff, or his bookkeeper or CPA were assisting Jane Doe in obtaining a refund, knowing or with reason to know that his representations were false.

115.   Upon discovering that Defendants Dr. Peterson and Sierra Internal Medicine did not intend to return her funds in 2022, Jane Doe demanded that they do so, or she would resort to legal remedies. Despite Jane Doe's repeated demands that the funds be returned promptly, Defendants Dr. Peterson and Sierra Internal Medicine have refused to return her property, to her detriment.

116.   By intentionally and substantially interfering with Jane Doe's right to possession of the money that she rightfully owns, Defendants Dr. Peterson and Sierra Internal Medicine have wrongfully converted the funds belonging to her.

117.   As a direct and proximate result of the conduct of Defendants Dr. Peterson and Sierra Internal Medicine, Jane Doe has been denied use of her money and has been damaged in an amount to be proven at trial, but that exceeds $40,200.

118.   The acts of Defendants Dr. Peterson and Sierra Internal Medicine alleged herein were willful, wanton, malicious and oppressive and, therefore, justify awarding exemplary and punitive damages.

119.   WHEREFORE, Jane Doe prays for judgment against Defendants Dr. Peterson and Sierra Internal Medicine as set forth below.

## FOURTH CAUSE OF ACTION

### (Civil Penalties for Receipt of Stolen Property under Penal Code § 496(c) Against Dr. Peterson and Sierra Internal Medicine)

120.   Jane Doe hereby incorporates by reference paragraphs 1 through 119 above, as though fully set forth herein.

121.   As set forth above, Defendants Dr. Peterson and Sierra Internal Medicine have wrongfully obtained possession of Jane Doe's money through conduct that constitutes fraud, theft and/or conversion under Penal Code section 496.

122.   Penal Code section 496(c) provides that "[a]ny person who has been injured by a violation of subdivision (a) ... may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees." Subdivision (a) provides for criminal punishment for "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained[.]"

123.   At all relevant times, Defendants knew that the funds at issue belonged to Jane Doe and were wrongfully obtained through conduct that constitutes fraud and/or theft.

124.   Furthermore, in January of 2022, while Defendants were in wrongful possession of Jane Doe's property, Jane Doe demanded that Defendants return her funds. Defendants refused and still refuse to deliver, and have not delivered, possession of the property, or any part thereof, to Jane Doe.

125.   As a result of this conduct, Jane Doe has been denied use of her property and has been damaged in an amount to be proven at trial, but that exceeds $40,200.

126.   Pursuant to Penal Code section 496(c), Jane Doe is entitled to recover three times the amount of her actual damages and an award of reasonable costs and attorneys' fees incurred in bringing this action.

127.   WHEREFORE, Jane Doe prays for judgment against Defendants as set forth below.

## FIFTH CAUSE OF ACTION

### (Restitution/Quasi-Contract or Unjust Enrichment Against Dr. Peterson and Sierra Internal Medicine)

128.   Jane Doe hereby incorporates by reference paragraphs 1 through 127 above, as though fully set forth herein.

129.   In the alternative, Defendants Dr. Peterson and Sierra Internal Medicine were unjustly enriched when they received and wrongfully took possession of Jane Doe's funds.

130.   At all relevant times, Defendants Dr. Peterson and Sierra Internal Medicine knew that the funds belonged to Jane Doe and that they were not authorized to keep the money without Jane Doe's consent or knowledge.

131.   Jane Doe was unaware, and could not have discovered with reasonable diligence, that Defendants Dr. Peterson and Sierra Internal Medicine had retained her money under false pretenses because Defendants took affirmative steps to conceal the scheme and maintain their wrongful possession of the funds.  For instance, Dr. Peterson made multiple representations that Defendants would and had purchased Jane Doe's one-year Ampligen supply with her money when, in fact, they had not.  Both Simmaron and Sierra Internal Medicine were well aware of these facts but concealed them from Jane Doe; they also misrepresented to Jane Doe that her money was being held in a separate escrow account specifically designated for Ampligen. Furthermore, Dr. Peterson represented to Jane Doe that she still had her "slot" in the trial and her "allotment" [sic] of Ampligen (either falsely because he had already evicted her from the trial or in an effort to deter her from pursuing a refund).  He also falsely represented to Jane Doe that he, his staff, or his bookkeeper or CPA were assisting Jane Doe in obtaining a refund, knowing or with reason to know that his representations were false.

132.   As a direct result of Defendants' conduct, Defendants Dr. Peterson and Sierra Internal Medicine have been unjustly enriched and must restore Jane Doe's property ($40,200) to her or pay restitution in an amount to be proven at trial, but that exceeds $40,200.

133.   WHEREFORE, Jane Doe prays for judgment against Defendants Dr. Peterson and Sierra Internal Medicine as set forth below.

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress Against All Defendants)

134.   Jane Doe hereby incorporates by reference paragraphs 1 through 133 above, as though fully set forth herein.

135.   Defendants' conduct caused Jane Doe to suffer severe emotional distress because, among other things, Defendants engaged in a pattern of conduct that kept Jane Doe in a perpetual state of fear of being removed or ejected from the Ampligen trial and losing the opportunity for a semi-normal future where she could manage her ME symptoms.  Defendants conduct constitutes a continuing wrong that compounded and eventually caused Jane Doe's emotional distress to become severe when she discovered in March 2022 that Defendants had stolen her money by secretly ejecting her from the trial, either in retaliation against her for requesting a refund or by attempting to deter her from availing herself of legal avenues in pursuit of the refund she was entitled to.

136.   Each of the Defendants had a special relationship with Jane Doe given the nature of the medical care provided and the fact that she was a participant in a clinical trial study of an investigational medicine.  Jane Doe was a patient of both Dr. Peterson and Sierra Internal Medicine and was part of the clinical trial run by Simmaron with Dr. Peterson as the principal investigator.  These relationships and Defendants' special knowledge of ME make Defendants' conduct all the more outrageous.

137.   Defendants were aware of the symptoms of ME, which include Post Exertional Neuro-Immune Exhaustion or PENE (a worsening of ME symptoms after minimal physical, mental, or emotional exertion, recovery from which can take days, weeks, months, or be altogether impossible) and adrenaline surges that result when ME patients, on occasion, have no choice but to overexert themselves (physically, cognitively, or emotionally), temporarily pushing themselves beyond their safe limits, resulting in PENE.

138.   Defendants nonetheless engaged in an ongoing pattern of extreme and outrageous conduct, subjecting Jane Doe to emotional distress for their own benefit and at Jane Doe's expense.  In addition to the conduct described above, Defendants engaged in additional extreme and outrageous conduct as part of their continuing wrong, all of which was done with reckless disregard of the probability, or worse, the intent that Jane Doe would suffer not only physical harm but also emotional distress.  Examples of such additional conduct are described below.

139.   Sierra Internal Medicine and Simmaron employed incompetent or inadequate staff, including an infusion nurse who improperly administered infusions, causing Jane Doe to undergo unnecessarily painful, distressing and harmful infusions of Ampligen.  For instance, in or around November 2013, the nurse improperly infused Jane Doe with Ampligen, resulting in an infiltration with an entire bottle of Ampligen.  This incident resulted in severe pain and loss of the use of her arm for about two weeks.  When Jane Doe and her husband raised the issue with Dr. Peterson and Sierra Internal Medicine, they were met with indifference.  Jane Doe did not feel safe receiving treatment from that nurse but had no recourse due to her fear that further complaints could result in her ejection from the clinical trial.  The nurse remained employed by Sierra Internal Medicine for years, forcing Jane Doe to miss infusions.

140.   Throughout the period during which Jane Doe was a patient of theirs, Dr. Peterson and Sierra Internal Medicine routinely engaged in improper billing practices, including double billing.  For instance, on several occasions, Dr. Peterson and Sierra Internal Medicine sent bills to Jane Doe more than 18 months after services were rendered.  Additionally, they sent bills that failed to properly account for Jane Doe's prior payments and her insurance company's payments.  On numerous occasions, Dr. Peterson and Sierra Internal Medicine did not bill Jane Doe's medical insurance nor provide her with proper invoices required for her to obtain reimbursement from her insurance company.  These inaccurate billing practices made it difficult for Jane Doe to confirm that Defendants' charges were legitimate, particularly given her cognitive and physical limitations, and caused Jane Doe financial stress.  Although Jane Doe raised these issues on numerous occasions, Dr. Peterson and Sierra Internal Medicine were unresponsive to her ongoing concerns.  Jane Doe did not report or otherwise take any action against Defendants out of fear of retaliation in the form of being ejected from the Ampligen clinical trial and, thus, unable to receive further Ampligen treatment.

141.   In 2019, Sierra Internal Medicine became a concierge practice.  Dr. Peterson represented to Jane Doe that, in order to continue seeing him, she would have to join MDVIP, a company that operates a network of so-called concierge physicians, and pay a yearly fee of $1,800.  Relying on this representation, Jane Doe agreed to join MDVIP so that she would not be

1   ejected from the Ampligen clinical trial.  In 2020 or 2021, she learned that Dr. Peterson's

2   representation was false and that he could and did continue seeing non-MDVIP patients.  During

3   her enrollment in MDVIP, Jane Doe had less access to Dr. Peterson than before despite his

4   contractual promise that appointments would be available the same or next day.  In fact, in 2021,

5   Jane Doe essentially lost access to Dr. Peterson altogether as she was unable to schedule an

6   appointment with him for months and never received lab orders that he promised to send to her in

7   October 2021 despite several follow-ups.  Given Dr. Peterson's lack of response, she eventually

8   gave up.

9        142.   Between February 2012 and around February 2015, Dr. Peterson and Sierra Internal

10  Medicine represented to Jane Doe that, under the trial protocol, she was required to complete two

11  exercise tolerance tests, i.e., CPETs, a year in order to remain in the Ampligen study.  However,

12  these tests were not required and, in fact, were optional.  As discussed above, CPETs are

13  extremely detrimental for ME patients and can cause severe post-exertional symptoms and side

14  effects in ME patients.  Based on Defendants' representations, Jane Doe agreed to undergo the

15  exercise tolerance tests, which aggravated her ME and caused her severe physical and emotional

16  suffering.  For instance, she experienced difficulty walking, was unable to speak above a whisper,

17  slurred her words, suffered severe insomnia, experienced pain in her lymph nodes, sore throats,

18  severe cognitive difficulties, weakness, muscle pain, histamine reactions, GI issues, inability to

19  focus her eyes, and other symptoms.  Had she known that the tests were optional, Jane Doe would

20  not have agreed to them.  Jane Doe only later discovered that the tests were optional after having

21  undergone years of exercise tolerance tests based on the representations of Dr. Peterson and Sierra

22  Internal Medicine that the tests were mandatory for her participation in the Ampligen study.

23  Although she was shocked and incredulous having been deceived into subjecting herself to harm

24  by Dr. Peterson and Sierra Internal Medicine, Jane Doe did not report or otherwise take any action

25  against Dr. Peterson or Sierra Internal Medicine out of fear of retaliation in the form of being

26  ejected from the Ampligen clinical trial and, thus, unable to receive further Ampligen treatment.

27  Upon information and belief, Dr. Peterson has used Jane Doe's test results to further his own

28  research and that of Sierra Internal Medicine for his personal benefit and to Jane Doe's detriment.

1      143.   In addition, Sierra Internal Medicine also failed to follow other protocol

2   requirements in a timely manner, such as providing Jane Doe with lab orders and questionnaires,

3   and notifying her of deadlines for Ampligen physicals, EKGs, and exercise tolerance tests.  As a

4   result, Jane Doe could not rely on Sierra Internal Medicine to fulfill its responsibilities and was

5   forced keep track of her own trial requirements and Ampligen orders, leaving her physically and

6   mentally exhausted.  Having to remain vigilant was physically and mentally exhausting, and Jane

7   Doe's health suffered as a result of this exertion.

8      144.   As a direct result of Defendants' conduct described herein, starting in 2017, Jane

9   Doe began suffering from refractory over-activation of the sympathetic nervous system, which she

10   has not been able to manage despite regular and ongoing use of numerous therapeutic strategies.

11   Specifically, Defendants' outrageous conduct has caused a severe and ongoing impact to Jane

12   Doe's emotional state and physical health via overstimulation of the HPA axis.  Jane Doe is unable

13   to return to a state of homeostasis that properly balances the parasympathetic and sympathetic

14   nervous systems, putting her in perpetual fight-or-flight mode that renders restful recovery even

15   less possible.

16      145.   In 2017, Defendants attempted to charge Jane Doe $220 in infusion costs, an amount

17   vastly exceeding the Medicare reimbursement rate.  Dr. Peterson and Sierra Internal Medicine

18   were participating Medicare providers and, at all times, aware that Jane Doe was a Medicare

19   patient.  This attempt to charge Jane Doe in excess of the Medicare reimbursement rate constitutes

20   illegal "balance billing."  Jane Doe should have been able to rely on Defendants' representations

21   due to their position as healthcare providers and clinical-trial administrators that they were billing

22   her within the confines of the law.  Yet they abused this position, either intentionally or through

23   their recklessness, and attempted to commit illegal balance billing to extract more money from

24   Jane Doe exploiting her desperation and eagerness to obtain more Ampligen and resume her

25   infusions.  Jane Doe did not report or otherwise take any action against Defendants out of fear of

26   retaliation in the form of being ejected from the Ampligen clinical trial and, thus, being unable to

27   receive further Ampligen treatment.  Instead, Jane Doe's took efforts to stop this impropriety

28   privately with Defendants and was eventually successful.  However, this effort required additional

1   mental and emotional exertion on her part and caused her fear that Defendants would retaliate by

2   withdrawing her from the study.

3       146.   Dr. Peterson secretly ejected Jane Doe from the Ampligen study without her consent

4   either in retaliation for her request for a refund or in an effort to conceal from her the fact that

5   Defendants' obligation to refund her had been triggered.  Dr. Peterson removed Jane Doe from the

6   study in violation of the study protocol and without notifying her of the removal.  He further failed

7   to repay the money she had given him for the express purpose of obtaining Ampligen.  Upon

8   learning of her removal from the trial, Jane Doe experienced considerable further emotional

9   distress.

10      147.   Dr. Peterson treated Jane Doe for over nine years, having a significant role in her

11  life and that of her family during that period as her primary care physician and sole source of

12  Ampligen, which had been a life-changing medication for Jane Doe.  His betrayal and unlawful

13  taking and retention of Jane Doe's money has been a source of severe emotional, mental and

14  physical anguish for Jane Doe.

15      148.   Instead of being able to put the Ampligen chapter of her life behind her and to try to

16  find other medical support, Jane Doe's trust regarding treatment for ME has been so damaged that

17  she has been unable to pursue any expert care since 2017 when her access to Ampligen ended

18  despite the fact that she lives in the Bay Area, where such expert care exists unlike in most parts of

19  the country.

20      149.   Defendants conduct described above was extreme and outrageous and done

21  intentionally or with reckless disregard for the probability of causing Jane Doe emotional distress

22  including feelings of despair, anguish, fear, and distress.  As a direct and proximate result of

23  Defendants' conduct, Jane Doe has suffered years of physical and mental anguish and distress,

24  which has become severe when she discovered that Defendants had stolen her money and ejected

25  her from the clinical trial.

26      150.   As a result of Defendants' conduct, Jane Doe has been harmed in an amount to be

27  proven at trial.

28      151.   WHEREFORE, Jane Doe prays for judgment against Defendants as set forth below.

## SEVENTH CAUSE OF ACTION

### (Violation Of Cal. Health & Saf. Code §123110 *et seq.*
### Against Dr. Peterson and Sierra Internal Medicine)

152.   Jane Doe hereby incorporates by reference paragraphs 1 through 151 above, as though fully set forth herein.

153.   Defendant Dr. Peterson is, and was at all times mentioned herein, a physician licensed by the Medical Board of California.

154.   Between February 2021 and February 2022, Jane Doe made at least six written requests and numerous oral requests for copies of Jane Doe's medical records from Dr. Peterson and Sierra Internal Medicine.  For instance, Jane Doe made written requests for her records on May 1, 2021, June 7, 2021, January 7, 2022, and February 4, 2022.  In response, Defendants either ignored her requests or promised her records would be forthcoming.

155.   Most recently, on March 7, 2022, a "special-projects" contractor for Sierra Internal Medicine called Jane Doe's husband claiming that Sierra Internal Medicine will provide Jane Doe's medical record, but that it would take three weeks.  Defendants Dr. Peterson and Sierra Internal Medicine did not follow through on that promise, either.

156.   To date, and more than a year after her initial request, Defendants Dr. Peterson and Sierra Internal Medicine did not provide Jane Doe with her medical records in response to any of these requests, and have not provided Jane Doe with her medical records despite these numerous requests.

157.   Jane Doe is willing and able to pay reasonable costs associated with the collection of documents, to the extent allowed by Health and Safety Code section 123110.

158.   WHEREFORE, Jane Doe prays for judgment against Dr. Peterson and Defendant Sierra Internal Medicine as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Jane Doe prays for relief as follows:

1      1.    For all compensatory damages, general and/or special, directly and proximately

2   resulting from the Defendants' wrongful acts, in an amount to be established according to proof at

3   trial;

4      2.    For an award of exemplary and/or punitive damages in an amount sufficient to

5   punish, deter, and make an example of Defendants;

6      3.    For an award of enhanced damages, including an award of treble damages as

7   provided under Penal Code section 496, and for punitive and exemplary damages;

8      4.    For an order requiring Defendant Dr. Peterson and Sierra Internal Medicine to

9   provide to Jane Doe copies of her medical records.

10      5.    For an award of attorneys' fees and costs of suit herein incurred;

11      6.    For an award to Jane Doe of pre-judgment interest at the legal rate; and

12      7.    For any further relief as the Court deems just and proper.

13

14   Dated:   April 28, 2022

                                        **BAKER & McKENZIE LLP**

15                                      Barry J. Thompson

16                                      Christina M. Wong

                                      Peter W. Shapiro

17

18                                      By:

19                                        Christina M. Wong

                                      Attorney for Plaintiff

20                                      JANE DOE

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiff Jane Doe hereby requests a trial by jury in this matter.

Dated:   April 28, 2022

BAKER & McKENZIE LLP
Barry J. Thompson
Christina M. Wong
Peter W. Shapiro

By: _____
Christina M. Wong
Attorney for Plaintiff
JANE DOE

41
COMPLAINT