UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANNETTE BURMEISTER., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL PETERSON, et al., <br><br> Defendants. | Case No. 22-cv-03178-AMO <br><br> **ORDER GRANTING MOTION TO DISMISS** <br><br> Re: Dkt. No. 55 |

Before the Court is Defendants Dr. Daniel Peterson and Sierra Internal Medicines' (collectively, the "Peterson Defendants") motion to dismiss for lack of personal jurisdiction. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the Court hereby **GRANTS** the motion to dismiss, for the following reasons.

**I.    BACKGROUND**

   **A.  Factual Background**

Plaintiff Jeannette Burmeister's ("Burmeister") allegations stem from a decade-long doctor-patient relationship with Dr. Daniel Peterson ("Dr. Peterson"), who treated Burmeister for Myalgic Encephalomyelitis ("ME") through an Ampligen study at Sierra Internal Medicine, his Nevada medical office. "Compl." (ECF 1-1) ¶¶ 38-42, 74-75.[1] Burmeister generally alleges that Defendants failed to fulfill or refund Burmeister's one-year supply of Ampligen, which she purchased from Defendants for $41,600, and that Defendants improperly removed her from the

---

[1] Because the Court is considering a motion to dismiss pursuant to Rule 12(b)(2), it accepts the factual allegations in Plaintiff's complaint as true. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (the court must take uncontroverted allegations in the complaint as true and construe conflicts in affidavits in plaintiff's favor).

Ampligen clinical trial. *Id*. ¶¶ 79-133; MTD at 8-9.

Dr. Peterson lives and works in Nevada. Compl. ¶ 5. He is the president, secretary, treasurer, director, and sole shareholder of Sierra, a Nevada corporation. *Id.* ¶ 6. Simmaron is a Nevada nonprofit founded by Dr. Peterson and does not join this motion as it has conceded personal jurisdiction. *Id.* ¶ 7; ECF 31 ¶ 18. Dr. Peterson maintains a Nevada and a California medical license, but his practice has been entirely in Nevada since the late 1990s. "Peterson Decl." (ECF 55-1) ¶ 5. The Peterson Defendants do not have property or bank accounts in California and do not pay California taxes. *Id.* ¶¶ 6-7.

In 2011, Burmeister's husband, Ed Burmeister, attended a presentation given by Dr. Peterson in Cupertino, California, on ME diagnosis and research. "Ed Burmeister Decl." (ECF 58-2) ¶ 6. One slide of the presentation referenced the need for "cooperative patients," which Mr. Burmeister understood to constitute "outreach" to potential patients. *Id.* ¶ 6. Mr. Burmeister approached Dr. Peterson about the possibility of Ms. Burmeister seeing him for treatment, and Dr. Peterson "indicated that [Ms. Burmeister] could contact him." *Id.* ¶ 7. Ms. Burmeister admits that she was already familiar with Dr. Peterson's expertise and had "made some preliminary efforts" to obtain a consultation with him. "Burmeister Decl." (ECF 58-1) ¶ 10. She "reached out to Dr. Peterson" by letter, asking for a work-up and consultation and sending patient information. *Id.* ¶ 11. Dr. Peterson offered her an appointment at Sierra in Incline Village, Nevada, which she attended on January 3, 2012. *Id.*

After Burmeister attended the initial appointment at Sierra, she joined Dr. Peterson's Ampligen trial, and he treated her at his Nevada practice for nine years. *Id.*; Compl. ¶¶ 40-42, 74-75, 147. Due to the experimental nature of Ampligen, Burmeister was responsible for purchasing her own supply of the drug, which Sierra stored and administered. *Id.* ¶¶ 43-44. Supplemental to this treatment, Dr. Peterson prescribed Intravenous Immunoglobin ("IVIG") infusions for Burmeister, which she initially received in the Nevada medical clinic. *Id.* ¶ 45; Burmeister Decl. ¶¶ 17-18. Beginning in 2015, Dr. Peterson provided the IVIG prescription to a home infusion company selected by Burmeister and she started receiving infusions at her home in California. Compl. ¶ 45; Burmeister Decl. ¶¶ 17-18. California nurses engaged by the home infusion

2

companies administered the IVIG infusions for the next five years and provided visit summaries to Dr. Peterson. Burmeister Decl. ¶¶ 17-18. Because Dr. Peterson has a California medical license, his patients did not need a California doctor to review prescriptions the patients filled in California. Peterson Decl. ¶ 18.

On March 13, 2017, Burmeister agreed to purchase a one-year supply of Ampligen from Dr. Peterson for $41,600, which would be stored at Defendants' office. Compl. ¶¶ 56-59. Shortly after, Defendants suspended Burmeister's treatment, preventing her from accessing the Ampligen. *Id.* ¶ 61. Defendants claimed that Burmeister had only been charged for the medicine she used and that the Peterson Defendants only purchased a four-week supply of Ampligen. *Id.* ¶ 62. In February 2018, the Ampligen treatment resumed until March 2022, when Defendants ejected Burmeister from the clinical study. *Id.* ¶¶ 68, 75. Burmeister's claims generally arise from the Peterson Defendants' failure to provide her with, or refund her for, the Ampligen, and subsequent ejection of her from the clinical study. *See id*. ¶¶ 79-133.

**B. Procedural Background**

On April 28, 2022, Burmeister filed a complaint in San Mateo Superior Court alleging seven causes of action against Defendants Dr. Daniel Peterson, Sierra Internal Medicine ("Sierra"), and Simmaron Research ("Simmaron") (collectively, "Defendants"). Burmeister alleges that Sierra and Simmaron are Dr. Peterson's alter egos. Compl. ¶ 11. Burmeister alleges (1) fraud; (2) breach of contract; (3) conversion; (4) civil penalties for receipt of stolen property; (5) restitution or unjust enrichment; (6) intentional infliction of emotional distress; and (7) violations of California Health and Safety Code Section 123120. *Id.* at 7. Defendants removed the action to this Court on May 31, 2022. ECF 1.

On October 31, 2022, the Peterson Defendants filed the first motion to dismiss for lack of personal jurisdiction. ECF 33. The Court denied the motion to dismiss without prejudice, finding that there were "too many unknowns to determine that there is no jurisdiction." ECF 45. The Court authorized the parties to take jurisdictional discovery over a 90-day period and reminded Burmeister that it is "conduct by a defendant – not facts about a plaintiff – that creates personal jurisdiction." *Id.*; *see Walden v. Fiore*, 571 U.S. 277, 284 (2014). Burmeister did not take any

jurisdictional discovery. On May 10, 2023, the Peterson Defendants filed a renewed motion to dismiss for lack of personal jurisdiction, the motion considered by this order. "MTD" (ECF 55).[2] The parties agree that there is no general jurisdiction. "Response" (ECF 58) at 20 n.7; "Reply" (ECF 59) at 4. Instead, they contest whether there is specific jurisdiction over the Peterson Defendants. *See* Response at 20-30.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim for lack of personal jurisdiction. "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006); *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (same). "The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach*, 453 F.3d at 1154. In determining whether the plaintiff has met that burden, courts must accept as true all uncontroverted allegations in the plaintiff's complaint and resolve all disputed facts in the plaintiff's favor. *Schwarzenegger*, 374 F.3d at 800 (citation omitted).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see also Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (same). California's long-arm statute permits jurisdiction to the full extent the due process clause permits. *Williams*, 851 F.3d at 1020; *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006); Cal. Code. Civ. P. § 410.10. "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 800-01. In reviewing the "nature and extent

---

[2] Burmeister incorrectly asserts that the renewed motion to dismiss is a "de facto motion for reconsideration" of the Court's denial of the motion. "Response" (ECF 58) at 18-19. Instead, the Court authorized the Peterson Defendants to file a renewed motion to dismiss after the jurisdictional discovery period closed if they still believed the Court lacked personal jurisdiction over them. ECF 45.

of the defendant's relationship with the forum state," the Supreme Court recognizes two types of personal jurisdiction: general and specific jurisdiction. *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citation omitted). As the parties agree that general jurisdiction does not apply here, the Court focuses on the requirements of specific jurisdiction. *See* Response at 20 n.7; Reply at 4.

Specific jurisdiction depends on the relationship between "the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 287 (citation omitted). In the Ninth Circuit, courts use a three-prong test to analyze whether specific personal jurisdiction exists over a non-resident defendant. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) ("*Glob. Commodities*"). First, the defendant must "purposefully direct his activities" at the forum or "perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum." *Id.* (citation omitted). Next, the claim must "arise out of or relate to" those forum-related activities. *Id.* Finally, the exercise of jurisdiction must comport with fair play and substantial justice – in other words, it must be reasonable. *Id.*; *see Williams*, 851 F.3d at 1023 (citation omitted). The plaintiff has the burden of satisfying the first two prongs of the "minimum contacts" test. *Pebble Beach*, 453 F.3d at 1154-55. If the plaintiff satisfies the first two prongs, the burden shifts to the defendant to "present a compelling case" that jurisdiction would not be unreasonable. *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King*, 471 U.S. at 476-78).

**III.   DISCUSSION**

The Court first examines whether Burmeister has satisfied the first two prongs of the minimum contacts test. As Burmeister does not satisfy these prongs, the Court need not look further.

**A.  Purposeful Availment and Purposeful Direction**

Under the first prong of the specific jurisdiction analysis, "the defendant must purposefully direct its activities toward the forum state, purposefully avail itself of the privileges of conducting activities there, or engage in 'some combination thereof.'" *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023) (citing *Yahoo!*, 433 F.3d at 1206). Whether the Court

5

analyzes jurisdiction under the "purposeful availment or direction" prong "turns on the nature of the underlying claims." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021). Courts in this circuit "generally focus [the] inquiry on purposeful availment when the underlying claims sound in contract and on purposeful direction when they arise from alleged tortious conduct committed outside the forum." *Id.* However, there is no "rigid dividing line" between the two concepts. *Glob. Commodities*, 972 F.3d at 1107. Because Burmeister's claims sound in both contract (e.g., breach of contract) and tort (e.g., fraud), both tests are relevant here. *Id.* Accordingly, the Court considers both tests in analyzing the first prong of the specific jurisdiction test.

### 1. Purposeful Availment

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. However, the "mere existence of a contract with a party in the forum state" is not enough. *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). Rather, courts consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing to determine if the defendant's contacts are substantial and not merely random, fortuitous, or attenuated." *Id.* (internal quotation marks omitted).

Burmeister contends that the Peterson Defendants purposefully availed themselves of California because Dr. Peterson "solicited the initial involvement at a meeting in Cupertino [California]." Response at 21. Burmeister's allegations in the Complaint show instead that she and her husband sought out Dr. Peterson's services. Dr. Peterson gave one presentation in Cupertino in 2011 about diagnosis, management, and research of ME. Peterson Decl. ¶ 11-12; Burmeister Decl. ¶¶ 10-11; Ed Burmeister Decl. ¶¶ 6-7. Burmeister's husband approached Dr. Peterson about the possibility of Ms. Burmeister becoming a patient, after which she "reached out to Dr. Peterson" for a consultation. Burmeister Decl. ¶ 10-12; Ed Burmeister Decl. ¶ 6. Burmeister admits that she had already made "preliminary efforts" to secure a consultation with

6

Dr. Peterson and "actively pursued" becoming his patient. *Id.* Burmeister does not allege that Dr. Peterson solicited patients at the presentation, much less has Burmeister alleged that Dr. Peterson sought out or made a "systematic or continuing effort" to provide services to California patients.[3] *See Wright v. Yackley*, 459 F.2d 287, 290 (1972) (citations omitted, emphasis in original) (finding that defendant's connection with the forum must "arise out of contacts that the 'defendant *himself*' creates with the forum State").

Moreover, performance of the contract at issue involved treatment in Peterson's Nevada clinic. *See* Compl. ¶¶ 44, 57, 75, 82-133. Indeed, under the agreement, and the parties "course of dealing," Burmeister received semi-weekly intravenous Ampligen infusions at Dr. Peterson's Nevada medical clinic. Compl. ¶¶ 41-42; *see Sher*, 911 F.2d at 1362. Contrary to Burmeister's contention, Response at 6, the mere fact that Burmeister signed and emailed the consent agreement to become Dr. Peterson's patient while she was in California does not show that the Peterson Defendants purposefully availed themselves of California's laws and protections. *See, e.g.*, *Sher*, 911 F.2d at 1362 (the "mere existence of a contract" was not enough to establish purposeful availment from Florida law firm representing California client in Florida proceeding, even where the lawyer made multiple trips to California in connection with the representation). Burmeister contends that Dr. Peterson treated other California residents and offers a declaration of a nurse from Dr. Peterson's practice who stated her belief about the percentage of his patients who are California residents. *See* ECF 58-3 ¶ 3. However, Burmeister has conceded that the court lacks general jurisdiction over Dr. Peterson, and the nurse's declaration is not enough to demonstrate

---

[3] The Court provided Burmeister with ample opportunity to show that the Peterson Defendants directed their conduct at California and that her injuries related to the defendants' forum contacts. In the order granting jurisdictional discovery, the Court directed Burmeister to consider specific questions about Dr. Peterson's recruitment of patients, if any, in California, and how Dr. Peterson's California medical license facilitated his treatment of Burmeister. *Id.* Burmeister failed to propound any jurisdictional discovery, and instead suggested that it is Defendants' burden to engage in such discovery. "Response" (ECF 58) at 18-19. The caselaw is clear that when a defendant moves to dismiss an action for lack of personal jurisdiction, it is the plaintiff's burden to allege personal jurisdiction. *See Pebble Beach*, 453 F.3d at 1154; *Schwarzenegger*, 374 F.3d at 800.

7

that the Peterson Defendants purposefully availed themselves of this forum. *See id.*; *cf. Ayla*, 11 F.4th at 980 (defendant intentionally targeted the forum through "significant advertising efforts").

Accordingly, Burmeister has not shown that the Peterson Defendants purposefully availed themselves of the privileges of California.

**2. Purposeful Direction**

Although Burmeister has not shown that Dr. Peterson solicited her to become a patient, the Court must consider whether the doctor's continued treatment of Burmeister in California rises to the level of purposeful direction. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017).[4] The Court employs a three-part test to assess purposeful direction, including whether Dr. Peterson "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that [he] knows is likely to be suffered in the forum state." *Morrill*, 873 F.3d at 1142 (citation omitted).

Here, Dr. Peterson used his California medical license to prescribe Burmeister's IVIG treatment and treat her in California – visiting her at home once, doing a few telephone appointments, prescribing her medicine, ordering lab work and scans, and directing California nurses to administer IVIG home-infusions. Response at 13-14, 23; Burmeister Decl. ¶¶ 14-18.[5]

The Peterson Defendants analogize their conduct to two cases where out-of-state doctors treated patients who lived in the forum state. In *Wright*, 459 F.2d at 288, a South Dakota doctor

---

[4] Burmeister continues to improperly rely on her own conduct in attempts to show personal jurisdiction. She argues that the Peterson Defendants' billing fraud and failure to provide medical records to her in California constitute sufficient contacts. Response at 28. However, Burmeister's allegations are clear that she requested these records or bills while living in California, and that the Ampligen treatment and billing occurred in Nevada. *See* Compl. ¶¶ 154-56. Accordingly, these contacts cannot establish personal jurisdiction over the Peterson Defendants. *Walden*, 571 U.S. at 284-85 (the court focuses on the contacts that "the 'defendant himself' creates with the forum state" not with people who reside there) (emphasis in original) (citation omitted); *Morrill*, 873 F.3d at 1143 (same).

[5] To the extent that Burmeister states that defendants' wrongful removal of her from the Nevada study caused severe emotional distress in California, Response at 6, she has not shown that the Peterson Defendants "expressly aimed" conduct at California. *See Morrill*, 873 F.3d at 1142, 1145 ("to establish the basis for specific personal jurisdiction, a tort must involve the forum state itself, and not just have some effect on a party who resides there").

treated a patient in South Dakota and mailed prescription refills to Idaho when the patient moved. While the doctor was "on notice" that the consequences of his services would be felt in Idaho, the doctor's conduct merely confirmed the old diagnosis and prescription. *Id.* at 289. The court reasoned that there was no personal jurisdiction as the residence of the patient was "irrelevant and incidental" to the services provided by the doctor. *Id.* at 290. Similarly, in *Prince v. Urban*, 49 Cal. App. 4th 1056 (1996), an Illinois doctor treated a California patient in Illinois. After returning to California, the patient had numerous paid phone consultations with the doctor, the doctor mailed medications directly to the patient, and the doctor arranged to have the prescriptions filled in California. *Id.* at 1058. Nevertheless, the court found no personal jurisdiction as the "essence of the relationship was that the California patient sought out the Illinois doctor in Illinois" and the California contacts were follow-up care to the initial treatment. *Id.* at 1064.

Here, the few telephone appointments and singular home visit that took place in California were "ancillary" to the clinical treatment in Nevada. *See Prince*, 49 Cal. App. 4th at 1059, 1061. However, Dr. Peterson's prescribing of IVIG infusions, directing California infusion companies to administer these infusions at Burmeister's home, and monitoring the treatment, Burmeister Decl. ¶¶ 17-18, amounted to more than merely follow up care, *cf. Prince*, 49 Cal. App. 4th at 1064, or confirming a previous diagnosis or prescription, *cf. Wright*, 459 F.2d at 289. The Court concludes that prescribing medicine, and providing years of oversight and monitoring the nurses administrating the infusions is sufficient to allege that the Peterson Defendants "expressly aimed" their conduct toward California. *See Schwarzenegger*, 374 F.3d at 806.

Having found that the Peterson Defendants directed their conduct at California, the Court turns to assess whether the Peterson Defendants' contacts relate to the subject matter of the lawsuit sufficient for the Court to have personal jurisdiction over them.

### B. Suit-Related Conduct

In addition to purposeful direction or purposeful availment, a plaintiff's claims must "arise out of or relate to the defendant's contacts" with the forum state to establish personal jurisdiction. *Ford Motor Co.*, 141 S. Ct. at 1025 (citation omitted). The Supreme Court in *Ford* clarified that there are two alternatives for satisfying this prong. Under the first, "but-for" causation test, courts

9

assess whether an injury "arise[s] out of" a defendant's contacts with the forum. *Id.* at 1026. There must be "a direct nexus . . . between a defendant's contacts with the forum state and the cause of action." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023) (citations and internal brackets omitted). However, "a strict causal relationship" is not required for a defendant's contacts to "relate to" a claim. *Ford*, 141 S. Ct. at 1026. Under the second, "relate to" test, when causation cannot easily be proved, courts examine whether (1) "similar injuries will tend to be caused" by the defendant's forum contacts, (2) the defendant "should have foreseen the risk that its contacts might cause injuries like that of the plaintiff," and (3) there is a "close connection between the [defendant's] contacts and injury." *Yamashita*, 62 F.4th at 505-06.

Here, Burmeister does not show that her injuries arise out of or relate to the Peterson Defendant's forum-related activities. Burmeister alleges that the Peterson Defendants failed to provide her with a one-year supply of Ampligen she purchased from them, which was to be stored and used at the Nevada clinic; made fraudulent allegations about the sale; failed to refund her; and wrongfully ejected her from the Nevada Ampligen study. Compl. ¶¶ 44, 57, 75, 82-133. This conduct occurred in Nevada.

The only forum contacts Burmeister alleges within the meaning of the specific personal jurisdiction test are the singular medical visit at Burmeister's home, the ordered laboratory tests, the IVIG infusions prescribed and supervised by Dr. Peterson, and an unspecified number of telemedicine appointments. Burmeister Decl. ¶¶ 16-18; Peterson Decl. ¶¶ 16-17. However, unlike cases where the defendant's contacts led to the cause of action, Burmeister does not allege that any injuries resulted from these forum contacts. *Cf. Jones v. Williams*, 660 F. Supp. 2d 1145, 1148, 1150 (N.D. Cal. 2009) (finding personal jurisdiction where plaintiffs alleged that defendants' tortious conduct took place during defendants' telephone therapy conversations, which were defendants' primary contacts with California); *Ayla*, 11 F.4th at 983 (defendants' contacts with the forum state "include the very same promotions, sales, and distribution of which Ayla complains"). Burmeister asserts that the treatment in California was an "integral component of the overall scheme" because they were "closely related to and intertwined with the clinical study." Response at 28; Burmeister Decl. ¶ 26. But these conclusory arguments fail to show how the IVIG infusions

1  relate to the alleged harm.

2  Although Burmeister concedes there is no general jurisdiction, she continues to argue that
3  there are sufficient contacts with the forum state based on actions unrelated to this suit. In
4  opposition to the motion to dismiss, Burmeister argues that Dr. Peterson treated her husband and
5  daughter, referring them to California specialists and ordering prescriptions. Response at 13; Ed
6  Burmeister Decl. ¶¶ 8-9. She also indicates that Dr. Peterson treated other California patients with
7  home infusions. ECF 58-3 ¶ 5. These facts do not support a showing of specific jurisdiction.

8  To be sure, California courts have found personal jurisdiction where out of state doctors
9  have treated forum state residents in cases where "the claims arose from services provided to the
10 plaintiffs in their home states." *Teed v. Patterson*, No. A155713, 2020 WL 3286321, at *4 (Cal.
11 Ct. App. June 18, 2020) (unpublished) (listing cases). Critically, Burmeister has not alleged that
12 there is a "close connection" between the IVIG infusions or any follow-up care in California and
13 her claims. *See Yamashita*, 62 F.4th at 506. At core, Burmeister's claims arise from a breach of
14 contract related to the Nevada Ampligen trial. Given that Burmeister has not alleged that her
15 injuries arose out of or are related to the Peterson Defendants' treatment of Burmeister in
16 California, this Court cannot find personal jurisdiction over the Peterson Defendants.

17 **IV.     CONCLUSION**

18 Because Plaintiff has failed to allege personal jurisdiction over Dr. Peterson and over
19 Sierra Internal Medicine, the Court **GRANTS** the motion to dismiss as to those defendants. Given
20 that Plaintiff had the opportunity to conduct jurisdictional discovery, ECF 33, and Plaintiff has
21 nonetheless failed to establish jurisdiction, the Court concludes that leave to amend would be
22 futile. *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008); *St Andrews*
23 *Links Ltd. v. Source & Design Int'l (UK) LTD*, No. 21-CV-06470-JST, 2022 WL 11902199, at *5
24 ///
25 ///
26 ///
27 ///
28 ///

(N.D. Cal. Oct. 20, 2022).  The Court therefore dismisses Dr. Peterson and Sierra Internal Medicine without leave to amend.

**IT IS SO ORDERED.**

Dated: February 8, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**